**W–I CANTEEN SERVICE, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 78–2283.

United States Court of Appeals, Seventh Circuit.

Argued June 12, 1979.

Decided Sept. 25, 1979.

Dennis M. White, Madison, Wis., for petitioner.

Paul J. Spielberg, N. L. R. B., Washington, D. C., for respondent.

Before PELL, SPRECHER and WOOD, Circuit Judges.

PELL, Circuit Judge.

The petitioner, W–I Canteen Service, Inc. (Canteen), seeks review of an order of the National Labor Relations Board. The Board has cross-applied for enforcement of its order. The Board found that Canteen violated sections 8(a)(1) and (3) of the National Labor Relations Act by discharging and otherwise penalizing employees for engaging in a sympathy strike. The determinative issue is the legality of the strike under two collective bargaining agreements negotiated by the petitioner and Retail Clerks Local 1354. Canteen argues that the

agreements clearly and unequivocally waived the right to engage in sympathy strikes at its premises and that the Board's interpretation of the agreements was erroneous. Also at issue is the Board's determination that Canteen violated section 8(a)(1) of the Act by coercively interrogating one of its employees about her union activities.

## I. Facts

### A. The Collective Bargaining Agreements

The petitioner, Canteen, services and maintains vending machines in the Rockford, Illinois, area. At its Rockford plant, Canteen and the Retail Clerks Union Local 1354 have been parties to three separate collective bargaining agreements covering three separate bargaining units. One agreement covers the service and maintenance unit. Members of this unit report to Canteen's Rockford facility to pick up goods for delivery to the premises of customers. Three members of this unit report directly to a nearby Chrysler plant and remain there all day without reporting to the Canteen Rockford facility. Another bargaining agreement covers members of the bakery unit, which produces some of the goods sold in the vending machines. The third agreement covers clerical workers. The service and maintenance agreement (Service Agreement) was first negotiated in 1968 and was renegotiated in 1969, 1972, and 1975. The bakery unit agreement (Bakery Agreement) was first negotiated in 1968 and was renegotiated in 1971 and 1974. The clerical unit agreement was entered into for the first time in 1976.

The 1975 Service Agreement, which covers the events at issue here, contains the following no-strike provision:

### ARTICLE XVIII

### STRIKE AND LOCKOUTS

The Company and the Union agree that there will be no strike or lockout during the life of this Agreement so long as the Company and the Union abide by the terms of this Agreement or submit to arbitration any differences which may arise which are not covered by this Agreement.

The following two provisions, appearing in separate articles of the same agreement, relate to picket lines:

### ARTICLE VII

### DISCHARGE AND DISCRIMINATION

*SECTION 3.* The Company will not, as a condition of continued employment, require the employees to cross any picket line established on or in front of the premises of any other company. The individual or concerted refusal to pass such a picket line shall not constitute grounds for discipline, discharge, and is not to be considered as violating any provision written or implied which prohibits the Union from striking.

\*     \*     \*     \*     \*     \*

### ARTICLE XVII

### MISCELLANEOUS

*SECTION 9.* In the event of a strike or lockout of any certified Union, it shall not be considered a violation of this Agreement for the members of the Union to refuse to deliver goods or service machines where such controversy is on. The Union agrees, however, that the accounts in the Company must be serviced and they will not in any way attempt to interfere with such servicing by Company personnel other than employees covered by this Agreement.

An arbitration article in the 1975 Service Agreement permits either party to initiate arbitration in the event of proper exhaustion of preliminary procedures. The scope of the arbitration provision is defined in this way:

The arbitrator shall have authority and jurisdiction to determine the propriety of the interpretation and/or application of the Agreement respecting the grievance in question, but he shall not have the power to alter or modify the terms of the Agreement. With respect to arbitrations involving discharge or discipline  .   .   . the arbitrator shall determine if the dis-

charge . . . was for just cause.
. . .

The no-strike clause of the 1974 Bakery Agreement covering the events at issue here is identical to the Service Agreement provision quoted above. The scope of the arbitration clause also is identical to the clause in the Service Agreement. The Bakery Agreement, however, has no picket line permission clause.

### B. *Past Conduct Under the Contracts*

The service and maintenance unit in Rockford has twice in the past engaged in a strike: during negotiations leading to their 1972 agreement and during negotiations leading to their 1975 agreement. The 1972 strike lasted two to three weeks. The 1975 strike lasted only a few days.

During the 1972 strike, the service and maintenance unit employees picketed the Rockford premises. Canteen's bakery did not operate, except to service the few contract obligations requiring performance during a strike. These obligations were carried out by supervisory personnel. None of the bakery unit employees crossed the picket line during the strike.[1] No bakery employee was subjected to discipline for failure to report to work during the period of the strike.

In 1973, Canteen discharged the service and maintenance employees who worked full-time at the Chrysler plant when they refused to cross a picket line established by auto workers at that plant. The employees protested and were reinstated. Canteen issued a written statement to the union concerning picket lines, which said in part:

Since 1957, the company's policy has been to allow any employee the right to decide whether or not to cross a picket line. This is a personal decision on his part and his decision to cross a picket line or not has been his decision to work or not to work. His refusal to not [sic] work is his decision to take, in essence, a voluntary lay-off. This has been the case in all previous instances, the employee has not worked until the picket line is removed or he is needed to help in other areas or routes.

In no instance in the past have any employees been discharged, disciplined or discriminated against due to their refusal to cross a picket line, all have been treated equally and fairly.

During the negotiations leading to the 1975 Service Agreement, the service and maintenance unit employees again went on strike and picketed Canteen's Rockford premises. The bakery operations again were cut back. Some employees did not work part of the time during which the picket line was up. Some of the workers returned to work during the strike, and Canteen directed the remaining bakery employees to return to work.

### C. *The 1976 Sympathy Strike*

In Madison, Wisconsin, Canteen maintains another facility engaged in the same business as the Rockford, Illinois, facility. Teamsters Local 695 was certified as the bargaining representative of the service and maintenance employees at this facility in March 1976. The Madison employees began a strike on May 4, 1976. On May 6, 1976, Retail Clerks Local 1354 held a meeting of employees of the three Rockford bargaining units. A Teamsters union representative attended the meeting and explained to the Rockford employees that the initial contract negotiations in Madison were not progressing satisfactorily and that the Madison employees were on strike. The Teamster representative proposed placing a picket line at the Rockford facility. The Rockford employees voted 14 to 14 on a request to support the Madison strike, and therefore no formal resolution of support was made. The Rockford local president, Merle Heitz, told the employees that it would be up to each individual to decide whether to honor a Teamsters picket line at the Rockford facility. After the meeting, one Rockford service and maintenance em-

---

1. The no-strike clause in the Bakery Agreement was the same at the time of the 1972 service and maintenance unit strike as it was at the time of the events at issue here.

ployee privately asked Heitz what would happen if Canteen should bring trucks across the Teamster picket line. Heitz told the employee that refusal to work under these circumstances would cost the employees their jobs.

Over the following weekend the Teamsters informed the Rockford local that a picket line would be set up in Rockford on Monday, May 10. The picket line was set up on that day at 5:00 a. m. Thirteen Rockford employees did not report to work. Of these thirteen, eleven were members of the service and maintenance unit.[2] In the bakery unit, only one of the six employees did not report for work. In the clerical unit, one of the five employees, Lisa Erickson, did not report.

On the morning of May 10, the first day of the picketing, eight of the employees who did not report for work met near the plant with a Retail Clerks business representative. The employees were advised to apply for food stamps and unemployment compensation. At another meeting later that morning an employee asked Merle Heitz what to do if Canteen called and requested them to return to work. Heitz instructed the employees to stay away from their phones. Heitz also instructed them that if the employer offered to bring work to them at a location where they would not have to cross the picket line, they would be fired if they did not perform the work. Canteen made efforts to reach the service and maintenance unit employees at home by telephone. The president of Canteen, Charles Swanson, ordered that employees who refused to come to work be told that they were fired. Canteen offered to deliver equipment to some of the employees so that they would not have to cross the picket line to perform their duties. None of the striking employees agreed to these terms.

The next day, Lisa Erickson, the clerical unit employee, called Canteen to find out whether she would be allowed to return to

work. Although Canteen had not called her for work or terminated her, Erickson had been told by Merle Heitz that the clerical unit contract was substantially different from the others and she would be subject to discipline if she did not return to work. Erickson was told by the company that she could return, and she reported for work the next day, May 12. When Erickson returned to work, she asked Charles Swanson whether she would be considered a continuing employee or a newly-hired employee. Swanson told Erickson that she would be considered a continuing employee. He wondered, however, why she refused to cross the picket line, because the office workers "weren't union" and had reported to work. He also expressed surprise at Erickson's refusal to cross the picket line, because Canteen had no record of her paying union dues[3] or enrolling in the union. He asked her whether she had ever signed a union card or paid dues. Erickson responded that she thought she was a union member, but that she had never signed a card or paid dues.

William Ambrosia was a service and maintenance unit employee with eight years of experience. He honored the picket line for two days, returning to work on May 12. On May 10, a Canteen supervisor called Ambrosia by two-way radio and told him to go home and to wait for a telephone call. In the late afternoon Ambrosia told his supervisor that he would not go to work because of the picket line. The supervisor informed Ambrosia that Canteen had applicants who wanted his job. The next day, Charles Swanson informed Ambrosia that he was fired. On May 12, Ambrosia reported to work and was told that he had to come back as a new employee and was required to fill out an application before being restored to his job.

Another service and maintenance employee, John Eells, was ordered on the first day of the picketing to pick up his truck at a

---

2. Other employees in the 25 to 30 member unit either crossed the picket line or picked up their trucks at other locations.

3. Canteen administers a check-off of union dues from its payroll in accordance with the contract. The contract does not contain a union security clause, however.

point away from the plant and go to work. Eells later called Charles Swanson and told him he would not work. Swanson told Eells that he was fired. On May 14, however, Swanson called Eells and told him he could return to work. When Eells reported to work, he was told that he could only return as a newly-hired employee and that he would have to fill out an application form. Although Eells and Ambrosia were restored to their previous rate of pay, they lost seniority and other benefits.

From the beginning of the picketing to May 17, Canteen hired only one new service and maintenance employee and no employees in the bakery or clerical units. Of the thirteen employees who originally honored the picket line, ten had not returned to work by May 17. On May 18, Canteen sent a letter to the union terminating all thirteen employees.[4] During the period of the sympathy strike, Canteen did not formally assert to the union that the work stoppage was a breach of the collective bargaining agreements. The Teamsters removed the picket line on July 6. On July 7, the ten remaining strikers reported to the Rockford facility with a union representative ready to return to work. Canteen informed the ten workers that they were no longer employed by the company.

### D. *The Board's Conclusion and Order*

The Board found that Canteen violated sections 8(a)(1) and (3) of the Act by firing the twelve sympathy strikers and by rehiring two of the strikers only as new employees. The Board also found that Canteen violated section 8(a)(1) of the Act by coercively interrogating Lisa Erickson concerning her union affiliations. The Board's order requires the company to cease and desist from the unlawful conduct and from interfering in any other manner with the exercise of section 7 rights. The order directs Canteen to offer full reinstatement, back pay, and full benefits to the twelve employees fired for their strike activities and to post appropriate notices.

**4.** Lisa Erickson, William Ambrosia, and John Eells of course had already been rehired, but use of the unemployment files as the source for

### II. Legality of the Sympathy Strike

It is well-settled that section 7 of the Act protects employees who engage in a sympathy strike in support of a lawful, primary strike by another union. *See, e. g., Gary Hobart Water Corp. v. NLRB,* 511 F.2d 284, 287 (7th Cir. 1975), *cert. denied,* 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252; *Teamsters Local 79 v. NLRB,* 117 U.S.App. D.C. 84, 325 F.2d 1011 (D.C. Cir. 1963), *cert. denied,* 377 U.S. 905, 84 S.Ct. 1165, 12 L.Ed.2d 176. It is equally well-settled that employees may waive this right in the collective bargaining agreement. *See Buffalo Forge Co. v. United Steelworkers of America,* 428 U.S. 397, 405, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976); *NLRB v. Rockaway News Supply Co.,* 345 U.S. 71, 80–81, 73 S.Ct. 519, 97 L.Ed. 832 (1953). The contractual waiver of this right, however, must be "clear and unmistakable." *Gary Hobart Water Corp. v. NLRB, supra.* In determining the scope of the unions' contractual no-strike obligation, the courts have engaged in

a case-by-case analysis of the language of the bargaining agreements in issue and on their operation within the factual circumstances of the labor controversy at hand.

*NLRB v. Keller-Crescent Co.,* 538 F.2d 1291, 1296 (7th Cir. 1976). *See Rockaway News, supra; Iowa Beef Processors v. Amalgamated Meat Cutters,* 597 F.2d 1138 (8th Cir. 1979). In light of these factors, we have concluded that both the 1975 Service Agreement and the 1974 Bakery Agreement clearly and unmistakably waived the employees' right to honor picket lines at Canteen's Rockford premises.

### A. *The Service Agreement*

Eleven of the twelve striking workers covered by the Board's order were subject to the 1975 Service Agreement. Despite the broad language of the no-strike clause in this agreement that there "will be

the names of the strikers led to erroneous inclusion of these names.

no strike or lockout during the life of this Agreement so long as the Company and Union abide by the terms of this Agreement," the Administrative Law Judge and the Board declined to interpret the clause as a waiver of the right to engage in a sympathy strike. The opinion of the ALJ, adopted by the Board, gave this premise for not applying the no-strike clause:

> . . . [I]n three recent decisions [citations omitted], the Board has held that similar or even more explicit no-strike language is not as clear as it might seem to be, and that implied in any such undertakings is an unspoken but real limitation, namely that the duty to refrain from striking is no broader than the terms of the grievance and arbitration machinery which is also contained in the contract.

Sympathy strikes normally involve disputes outside the scope of the employees' contract with their employer.[5] It thus follows from the premise quoted above that a duty to arbitrate disputes under the contract will not preclude a sympathy strike. The Board has reasoned in this case that the Service Agreement arbitration clause, which gives the Arbitrator "authority and jurisdiction to determine the propriety of the interpretation and/or application of the Agreement respecting the grievance in question . ." limits the no-strike obligation of the union strictly to grievances under the agreement.

■ This principle of coterminous application of the arbitration and no-strike clauses, see *Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 368, 382, 94 S.Ct. 629, 38 L.Ed.2d 583 (1973), however, is not without exceptions. The Board's slavish application of the principle to the no-strike clause before us disregards the plain language of the agreement. The principle is merely a rule of contract interpretation and the parties may by express language indicate their intent to interpret the no-strike and arbitration clauses differently. *See id.; Gary Hobart Water Corp. v. NLRB, supra.* See also *Iowa Beef Processors, supra.* The no-strike clause of the Service Agreement expressly extends beyond the scope of the arbitration clause. It not only applies as long as parties abide by the agreement, which of course includes the arbitration of disputes under the contract, but also applies as long as "the Company and the Union . . . submit to arbitration any differences which may arise *which are not covered by the Agreement.*" (Emphasis added). The Board's opinion does not mention this language at all.[6] From this language in the no-strike clause we conclude that the Board erroneously applied the principle of coterminous application to the arbitration and no-strike clauses. These clauses are analytically distinct, and their meaning must be determined separately and according to the intent of the parties. *See Gateway Coal, supra,* 414 U.S. at 382, 94 S.Ct. 629; *Iowa Beef Processors, supra,* 597 F.2d at 1145.

■ Having concluded that the no-strike clause contains no implied exclusion of sympathy strikes, we now turn to the express terms of the clause to determine whether they clearly and unmistakably waive the right to engage in a sympathy strike at the

---

5. *But see NLRB v. Keller-Crescent, supra* (when legality of sympathy strike is an arbitrable issue and employer seeks arbitration, the union is under an implied duty not to strike pending arbitration of the dispute as to the legality of the strike).

6. In its brief before this court the Board argues for the first time that the inclusion of the term "not" in the no-strike clause "seems inadvertent." The Board's reasoning is that the effect of the term "not" would be to "exclude from arbitration the only kind of 'differences' which an arbitrator is qualified to resolve under the terms of this agreement." We disagree. The effect of this provision is to create an additional duty not to strike and to arbitrate over events not foreseen by the parties. The record in fact shows that at one time the employer expressly proposed removal of the term, "not," presumably for the purpose of narrowing the scope of its duty to arbitrate. The union, however, rejected the employer's contract package of which this proposal was a part. It would seem that the deletion of an inadvertent term would easily have gained the consent of both parties. Furthermore, the term "not" appears in the Bakery Agreement no-strike clause. The persistent reappearance of this term is completely inconsistent with its being inadvertent.

employer's premises. As a preliminary matter, we note that the Board cannot find support in any judicial or Board decisions for a rigid requirement that the no-strike clause contain the specific term "sympathy strike" before finding a waiver. A number of cases have interpreted general no-strike clauses to preclude sympathy strikes. *Rockaway News, supra; Iowa Beef Processors, supra; Montana-Dakota Utilities Co. v. NLRB,* 455 F.2d 1088 (8th Cir. 1972); *Hearst Corp., Baltimore News American Division,* 161 NLRB 1405 (1966), enf'd sub nom. *News Union of Baltimore v. NLRB,* 129 U.S.App.D.C. 272, 393 F.2d 673 (D.C. Cir. 1968).[7] Conversely, we do not mean to imply that the general language of a broad no-strike clause, when examined in isolation, will suffice to waive the right to engage in sympathy strikes. *See Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956). Rather, the controlling principle of interpretation of collective bargaining agreements requires that the contract be read as a whole and in light of the law relating to it when made. *Id.,* 350 U.S. at 279, 76 S.Ct. 349.

As we have noted above, the 1975 Service Agreement contains two picket line clauses in addition to the broad no-strike clause. First, the picket line clause of Article VII, section 3 permits service and maintenance employees to honor picket lines "on or in front of any other company." Most significantly, this section, by its express terms, is an exception to the no-strike clause; it says that this specific form of

sympathetic activity "is not to be considered as violating any provision written or implied which prohibits the Union from striking." It follows from the phrasing of this clause as an express exception that the no-strike clause relates to sympathy strikes as well.

The meaning of the no-strike clause is further clarified by reading it in conjunction with the other picket line clause in Article XVII, section 9. This clause contains a union promise not to interfere during a sympathy strike with Canteen's efforts to service customers with non-union employees. The clause also states that "The Union agrees . . . that the accounts of the Company must be serviced. . . . ." In *Montana-Dakota Utilities, supra,* the court of appeals relied on a similar general statement in the applicable no-strike clause[8] to determine that a limited picket line permission clause served merely as an exception to what was otherwise a prohibition of sympathy strikes in the no-strike clause. *See* 455 F.2d at 1092–94.[9]

The NLRB argues in reply that an affirmation of the statutory right to honor pickets at other premises does not impliedly waive other statutory rights, namely the right to honor pickets at the employer's premises. Canteen, however, has not argued that the picket line permission clauses express such a waiver. The clauses are crucial here because they delineate the boundaries of the waiver expressed in the no-strike clause.

---

**7.** In fact the ALJ's opinion said that one of these NLRB decisions, *Hearst Corp., supra,* must have been overruled *sub silentio* by the Board's more recent decisions in, for example, *Kellogg Co.,* 189 NLRB 948 (1971), enf'd, 457 F.2d 519 (6th Cir. 1972) and *Keller-Crescent Co.,* 217 NLRB 685, *enforcement denied,* 538 F.2d 1291 (7th Cir. 1976). In *Hearst* the Board held that although the language of a broad no-strike clause alone did not clearly and unambiguously waive the right to strike, evidence of bargaining history did show that the language was intended to create such a waiver. In its Decision and Order in this case, the Board expressly rejected that portion of the ALJ's opinion and reaffirmed *Hearst,* saying, "In *Hearst,* as in the other [more recent] cases, the Board looked to collateral evidence of in-

tent of the parties to interpret the meaning of ambiguous no-strike clause language."

**8.** The clause said that "the Company is engaged in public service requiring continuous operation, and it is agreed, in recognition of such obligation . . . that, during the term of this Agreement there shall be no collective cessation of work by members of the Union." 455 F.2d at 1090.

**9.** In *Montana-Dakota Utilities,* the picket line clause expressly prohibited discharge of sympathy strikers, but said nothing about discipline of employees for honoring a picket line. The court held that discipline for such activity was permitted by the no-strike clause.

When the no-strike clause was drafted in 1966, the Board law had not developed the rigid presumption, *see, e. g., Keller-Crescent Co., supra,* that general no-strike clauses do not waive the right to engage in sympathy strikes. Apparently because knowledge of this recently developed presumption in the Board law cannot be imputed to the drafters of the collective bargaining agreement, the Board relies on a sentence in the arbitration clause that says "the parties are mindful of and have no wish to detract from any employee right guaranteed by law," as contractually creating a presumption of non-waiver, which may limit the scope of the no-strike clause. This argument is persuasive only if the quoted phrase is examined out of its context.[10] Examined in context, the quoted phrase modifies the stated preference that union officials screen employee grievances. Its effect is to preserve statutorily guaranteed direct employee access to grievance machinery without union involvement. For the Board to interpret this phrase as bearing on the no-strike clause ignores the common sense meaning of the phrase, "in this regard."

■ Although we are satisfied that the language of the no-strike clause is sufficiently clear to preclude sympathy strikes at Canteen's Rockford facility, we nevertheless turn to a discussion of the extrinsic evidence of intent in the record, most of which relates to bargaining history. Neither side disputes its relevance to the issue, and, in this case, the evidence shows that the parties specifically considered the issue of sympathy strikes and that the union has foregone this right.

The no-strike clause was proposed by the union in 1966 during negotiations leading to the first contract and has remained unchanged in the contract ever since. The union also proposed at that time a clause specifically reserving the right to honor picket lines at the employer's premises, which was rejected.[11] Furthermore, the Article XVII, section 9 picket line clause did not recognize the company's need for continuous service. This clause was added at the request of the company. The rejection of the union's proposed employer premises picket line clause left only the general no-strike clause and the picket line clauses referring to other premises in Article VII, section 3 and Article XVII, section 9.[12]

The NLRB found that this evidence of bargaining history does not show a waiver

10. The section says:

It is the intention of the parties hereto to conduct their affairs in such a manner that grievances will not arise. The Union will do its best to see that baseless and dilatory claims of grievance will not be processed, and to that end it is the desire of the parties that any employee believing himself to have a grievance discuss the matter with the Steward and the Business Representative of the Union before embarking upon the procedure for adjusting grievances herein set forth. In expressing their desire in this regard, the parties are mindful of and have no wish to detract from any employee right guaranteed by law.

11. The proposed clause said:

Neither shall it be a violation of this Agreement nor shall any employee be discriminated against for refusing to work for the Employer when there is a picket line on the Employer's premises, recognized by both the Local Union and the Retail Clerks International Association. . . .

12. In 1969 the Article VII, section 3 picket line clause was changed slightly. In 1966 the clause referred to pickets "on or in front of the premises *or at the premises* of any other company." The italicized phrase was removed in 1969. The employer representative testified that the phrase was removed because of employer concern about a picket line at the premises by the then newly-organized bakery unit. The union representative also testified that the possibility of such a picket line was discussed. The ALJ, however, disregarded the testimony that the deletion of the phrase was related to Canteen's concern about picketing at its premises, reasoning that the testimony was self-serving and irrelevant because the Article VII, section 3 picket line clause was always clearly limited to other premises. We cannot agree that the language was as unambiguous as the ALJ seemed to think it was. It appears logically consistent to us in the light of the contract proposal rejections in 1966 that the employer, upon noting that the deleted phrase "at the premises" was susceptible of interpretation as meaning its own premises, would want to remove this possibility. That this was accomplished buttresses the evidence that the right to honor stranger picket lines *at* Canteen's own premises was waived in 1966.

and in its brief cites *Timken Roller Bearing Co. v. NLRB,* 325 F.2d 746 (6th Cir. 1963), *cert. denied,* 376 U.S. 971, 84 S.Ct. 1135, 12 L.Ed.2d 85; *NLRB v. Otis Elevator Co.,* 208 F.2d 176 (2d Cir. 1953); *NLRB v. J. H. Allison Co.,* 165 F.2d 766 (6th Cir. 1948); and *Leland-Gifford Co.,* 95 NLRB 1306 (1951), *enf'd in relevant part,* 200 F.2d 620 (1st Cir. 1952) to support this conclusion. These cases, however, merely hold that a union's failure to gain express recognition of a right will not evidence a waiver when the collective bargaining agreement is silent on the issue. As we have already noted, this contract contains express provisions on the subject of sympathy strikes, and the evidence of defeated proposals during negotiations is therefore reliable evidence that the language waives the right. *See Rockaway News Co., supra* (evidence offered to show employer rejected union picket line clause shows broad no-strike clause was a waiver); [13] *News Union of Baltimore, supra* (proposal by union during negotiation specifically exempting picket from no-strike clause shed light on intended scope of no-strike clause; court enforces NLRB order interpreting the no-strike clause as a waiver).

We shall also consider only briefly the evidence of conduct offered by the parties, which was not specifically considered by the ALJ or the Board as reflecting on the meaning of the agreement. The record contains evidence of statements by the union leadership that for a worker to refuse work because of the picket line would be taking his job in his hands. Also there was testimony that the strikers were told not to answer their phones so that the employer could not order them to perform work. It is unlikely that a union leader would advise such conduct in the absence of a waiver:

> The union tradition of honoring picket lines is admittedly strong, but, just as its waiver in formal contract language is not to be precipitately assumed, so it is unlikely that responsible, experienced and authoritative union leaders will lightly interpret their own handiwork as barring its observance.

*News Union of Baltimore, supra,* 393 F.2d at 678.[14]

Although the Board's interpretation of contract provisions is entitled to deference, *see id.,* the interpretation of the Service Agreement urged here is unsupported by the language of the agreement and disregards much of the relevant extrinsic evidence. Accordingly, enforcement of the Board's order regarding the eleven service and maintenance unit employees must be denied.

## B. The Bakery Agreement

The Board's opinion and its brief before this Court contain virtually no consideration of the Bakery Agreement separate from the Service Agreement. The parties to the agreements were the same, and Merle Heitz, the president of the union, which represented both units, testified that the broad no-strike clause of the Bakery Agreement was modeled on the Service Agreement. It is true that the Bakery Agreement contains no picket line clause, but these employees do not travel. It was thus unnecessary for the union to seek such an

13. There has been doubt expressed about whether the *Rockaway News* decision even relied on the bargaining history, see *Local 18, Operating Engineers,* 238 NLRB No. 58 (1978) (Member Penello, concurring in the result), or whether the Court simply held that the broad no-strike clause alone sufficed to show a waiver. The general interpretation of the decision, however, is that the Court did rely on the bargaining history to interpret the provision, *see, e. g., News Union of Baltimore, supra; Montana-Dakota Utilities Co., supra.* Regardless of whether the evidence of bargaining was crucial to the Court's decision, we read the case as deciding at the very least that this evidence constitutes a relevant source for discerning the intent of the parties.

14. On appeal the NLRB has relied on the employer letter following the Chrysler plant sympathy strike, quoted *supra,* as evidencing the employer's understanding of nonwaiver. We are somewhat surprised by this argument, however, because the ALJ (and the Board) found that the context of the letter limits it to the legality of sympathy strikes at other premises, conduct clearly permissible under the contract. We agree that the letter does not help in the determination of the issue before us.

exception to the no-strike clause, and the Board found that this was the reason for its omission. We therefore cannot consider the absence of the exception as indicative of a different intent of the parties under the Bakery Agreement.[15]

In its brief, the Board has described evidence, summarized *supra*, that the bakery unit employees engaged in a sympathy strike to honor service unit picketing during negotiation of the 1973 and 1975 Service Agreements. Any assertion by the Board, however, that the employer's failure to discipline bakery employees during these periods constituted condonation of a sympathy strike is not supported by substantial evidence.

Significantly, the Board gave little consideration below to these work stoppages in interpreting the contracts. The president of Canteen, Charles Swanson, testified that when service unit employees struck, Canteen could not supply bakery goods to any account unless the contract with the customer required it, because of the absence of delivery personnel. From this evidence, it is difficult to conclude that the failure to discipline bakery workers constituted employer acceptance of a sympathy strike at its premises. In fact, the evidence shows that the employer asked one bakery worker to return to work before the end of the brief 1975 strike, and that during this strike, the other bakery workers reported to work after only a few days. Finally, from the evidence it appears that the union did not interpret the previous shut-downs as sympathy strikes. The union business agent testified that it was his understanding that in 1972 the company told bakery workers to stay home.

In conclusion, we emphasize that the Board has presented no evidence to support an interpretation of the no-strike clause of the Bakery Agreement different from that of the Service Agreement. The Board has given little separate treatment to the Bakery Agreement in its decision and in its brief in this court.[16] In these circumstances, we conclude that the Bakery Agreement, like the Service Agreement, waives the right to engage in a sympathy strike. Accordingly, enforcement of the Board's order relating to Florence Jahnke, the bakery employee, is also denied.

To conclude our discussion of the waiver issue, we must question the Board's practical defense of its principles of contract interpretation. The Board says in its opinion:

> The employees who were called upon during the early morning hours of May 10 to decide whether or not to cross the Teamsters picket at Rockford could benefit from none of these niceties of litigation and had at their disposal none of these aids [e. g., extrinsic evidence of bargaining history and conduct of the parties] to contract interpretation. Yet they had to stake their jobs on the correctness of their position.

The contracts in issue, however, said that "there will be no strike or lockout during the life of this Agreement . . .," and we are inclined to think that, to the extent workers actually rely on the language of the contract in determining their actions, any layman unschooled in current Board law presumptions would conclude from this language alone that the contract precluded the strike at issue here.

### III. The Interrogation of Lisa Erickson

In finding that the conversation between Charles Swanson and Lisa Erickson constituted a coercive interrogation in violation of section 8(a)(1) of the Act, the Board said only that "the context in which this questioning occurred was clearly coercive." In its brief, the Board offers some post hoc

---

15. We note that the Bakery Agreement does not contain the broad statement in its arbitration clause that "the parties are mindful of and have no wish to detract from any employee right guaranteed by law," considered so crucial by the Board in interpreting the Service Agreement. We, however, do not give its absence

any weight, having concluded that it bears no relation to the subject of strikes.

16. In fact, the Board has relied on the evidence of past sympathy strikes by the bakery unit employees, discussed *supra*, as support for its interpretation of the Service Agreement.

elaborations on this finding, asserting that the employer "initiated the subject of her union activities," and emphasizing that twelve of Erickson's co-workers were eventually fired or penalized.

In *A & R Transport, Inc. v. NLRB*, 601 F.2d 311 (7th Cir. 1979), we held that an interrogation should be judged by the "totality of the circumstances, including the purpose of the interview, the entire statement made to the employee, and the scope of the questioning." 601 F.2d at 313. Judged under this standard, the record before the Board does not contain substantial evidence of coercion. It is not disputed that Erickson approached Swanson to determine whether she would be made a new employee for participating in the strike, and thus, the record refutes the Board's assertion that Swanson initiated the subject. Equally clear is that Erickson understood the purpose of the employer's questions and that the questions did not go beyond the purpose of the interview. The fact alone that other strikers eventually were fired does not make this interview coercive.

For the reasons herein set forth the petition for review is granted and enforcement of the Board's order is denied.

ENFORCEMENT DENIED.

SPRECHER, Circuit Judge, dissenting.

As the majority correctly notes, a waiver of the right to strike should be in clear and unmistakable language. *Gary Hobart Water Corp. v. National Labor Relations Board*, 511 F.2d 284, 287 (7th Cir. 1975), *cert. denied*, 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1975). The purported waiver here is considerably less than that. The no-strike language reads (Art. XVIII):

> The Company and the Union agree that there will be no strike . . . so long as the Company and Union . . . submit to arbitration any differences which may arise which are not covered by this Agreement.

The sympathy strike involved here was "not covered by this Agreement" and the issue involved was not submitted to arbitration. In addition, any employee or union official reading the contract would find the following clauses:

> The Company will not, as a condition of continued employment, require the employees to cross any picket line established on or in front of the premises of any other company (Art. VII, Sec. 3).

> \* \* \* \*

> In the event of a strike or lockout of any certified Union, it shall not be considered a violation of this Agreement for the members of the Union to refuse to deliver goods or service machines where such controversy is on (Art. XVII, Sec. 9).

> \* \* \* \*

> . . . [T]he parties are mindful of and have no wish to detract from any employee right guaranteed by law (Art. XIX, Sec. 1).

Absent a clear and unmistakable waiver, the right to participate in a sympathy strike is an employee right guaranteed by law. *Buffalo Forge Co. v. United Steelworkers of America*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976).

Finally, in 1973, after the Company was compelled to reinstate some employees whom it had fired for honoring a picket line outside a customer's plant, it sent a statement of policy to the Union, which read in part:

> In no instance in the past have any employees been discharged, disciplined or discriminated against due to their refusal to cross a picket line, all have been treated equally and fairly.

I respectfully dissent. I would deny the petition for review and would grant enforcement of the Board's order.