**AMCAR DIVISION, ACF INDUSTRIES INCORPORATED, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 80–1154.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 13, 1980.

Decided Feb. 9, 1981.

Paul J. Spielberg, Deputy Asst. Gen. Counsel, N. L. R. B., Washington, D. C., for respondent.

Louis N. Laderman, St. Louis, Mo., for petitioner.

Before STEPHENSON and HENLEY, Circuit Judges, and HUNTER,* District Judge.

STEPHENSON, Circuit Judge.

Amcar Division, ACF Industries, Inc. (Amcar) petitions for review of a final decision and order of the National Labor Relations Board.[1] The Board, in reversing the decision of the administrative law judge, found Amcar to have committed unfair labor practices under section 8(a)(1) and (3) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(1) and (3). The NLRB has filed a cross-application for enforcement of its order. The Board found that Amcar committed the unfair practices when it (1) warned employees that they would be charged with unexcused absences if they engaged in a "sympathy strike" by not crossing another union's picket line at the Amcar plant, and (2) subsequently used absences occurring during the period the picket line was maintained in disciplining employees. Because we conclude the Union[2] had waived its employees' right to engage in such a sympathy strike, we deny enforcement of the Board's order.

## I. FACTS[3]

Amcar is engaged in the manufacture and sale of railroad freight cars and related products at its facility in St. Louis, Missouri. Two collective bargaining units exist at the Amcar plant, a large "production and maintenance" (P & M) unit consisting of approximately fourteen hundred (1400) employees, and a small maintenance electrician unit consisting of approximately thirty-five employees. The latter were represented by the International Brotherhood of Electrical Workers, Local 1, AFL–CIO (Local 1), while the P & M unit is represented by five jointly certified unions (Union).[4]

### A. The 1978 Labor Dispute

On October 20, 1978, the maintenance-electrician employees represented by Local 1 established a picket line at the Amcar plant in support of its demands for a new collective bargaining agreement, the former agreement expiring at midnight on October 19, 1978. The picket line was maintained from October 20, 1978 through November 14, 1978.

On October 19, 1978, in anticipation of the strike and picket line by Local 1, Robert Allen, Amcar Director of Labor Relations, proposed to James Johnson, the business agent for the Carmen and the Union's chief

* The Honorable Elmo B. Hunter, sitting by designation on this panel, is now Chief Judge of the United States District Court for the Western District of Missouri.

1. *Amcar Division, ACF Industries, Inc.*, 247 N.L.R.B. No. 138 (1980) (2–1 decision) (Truesdale, Member, dissenting). Member Truesdale dissented on grounds that there was a waiver of right to engage in a sympathy strike under section 7 for the reasons stated by the administrative law judge.

2. *See* note 4 *infra.*

3. Our recitation of the facts is primarily based on the joint stipulation of the parties before the Board and the largely undisputed summary of the facts made by the ALJ.

4. Brotherhood of Railway Carmen of the United States and Canada, Lodge No. 365, AFL–CIO–CLC; International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, Local No. 27, AFL–CIO; International Association of Machinists and Aerospace Workers, District No. 9, AFL–CIO; International Brotherhood of Firemen, Oilers and Maintenance Men, Local No. 6, AFL–CIO; and International Brotherhood of Electrical Workers, Local No. 1, AFL–CIO.

negotiator for the 1978 contract negotiations, that Amcar and the Union give the following as a joint notice to the plant P & M unit employees:

NOTICE

TO: ALL ST. LOUIS PLANT EMPLOYEES

The collective bargaining unit agreement between the Company and the I.B.E.W. covering the maintenance electricians terminates tonight at twelve midnight. At this time a new agreement has not yet been reached. The parties are still meeting. However, if an agreement is not reached the I.B.E.W. may post pickets at the plant after twelve midnight tonight.

Nevertheless all employees other than those maintenance electricians affected are expected to report to their jobs as scheduled. All other employees have an agreement in effect which contains a no-strike clause. Any employee who refuses to report to his job may be considered to be in violation of the no-strike clause and will be counted as absent.

What followed is largely undisputed and well-summarized in the findings of the administrative law judge:

Johnson said that he agreed that the production and maintenance employees should cross the picket line, but that he would not sign the notice unless he heard from the Union's counsel, although he (Johnson) thought the notice was accurate. Allen then took it upon himself to contact the Union's counsel who stated that he also thought that the production and maintenance employees should cross the picket line, but that he would not advise the Union either way on whether they should sign the notice. Allen next tried to contact Johnson again, but was unable to do so before the end of the first shift at the plant, i. e., the latest time by which notice could be given to the first shift employees prior to the strike. The Company then proceeded to unilaterally distribute the above notice to all of the plant employees, over the signature of plant manager W.D. Harrison. The next day, i. e. the first day of the strike, Allen sent a telegram to the Union in which he protested that the maintenance electrician employees were engaging in mass picketing which prevented some other employees from reporting to work. Allen restated the Company's position that the no-strike clause of their contract precluded the production and maintenance unit employees from honoring the picket line, and he demanded that the Union "take any and all steps reasonable and necessary to insure that the employees of the Company represented by said jointly certified unions report for and perform work at the Company's premises, and that said Article VIII not be violated." That same day (October 20) business agent Johnson told Allen that as far as he was concerned, the employees should cross the picket line.

None of the employees informed Amcar that they would be absent during the period because of the picketing, nor did they offer this as an excuse upon returning. Amcar stipulated that had such an excuse been offered it would have been rejected. It was stipulated that four employees have been discharged and twenty employees have been suspended for absenteeism, with one or more of the absences occurring during the period from October 20, 1978 to November 14, 1978. There were also others absent during that time who could be disciplined for absenteeism based in part on the absences during this period.

B. *The Collective Bargaining History*

Amcar and the Union have been parties to a series of collective bargaining contracts effective from 1969 to 1972, 1972 to 1975, 1975 to 1978, and the current contract executed in 1978, which was in effect at the time of the strike by Local 1. Since 1969, every collective bargaining agreement between Amcar and the Union has contained the following "no-strike" clause: ",During the term of this Agreement there shall be no lock-out, strike, stoppage of work or slow down." Each contract has also con-

tained a grievance procedure and binding arbitration for grievances. The 1978 contract, in effect at the time of the strike by Local 1, defined "grievance" as "any dispute or difference between the employees and the Company involving the meaning or application of the terms of this Agreement."

The collective bargaining history is explained by the detailed joint stipulation filed by the parties before the Board. We set out its discussion of this history in full:

"14. Following the negotiation of the 1969–1972 contract, picket lines were set up by IBEW Local 1 representing and on behalf of employees other than maintenance electrician employees and by Firemen and Oilers Local 6. These picket lines were set up by IBEW Local 1 and Firemen Local 6 in support of the contract demands of those unions. Employees of Respondent represented by the Brotherhood of Railway Carmen, Boilermakers Local 1012 and District No. 9, International Association of Machinists refused to cross the picket lines of IBEW Local 1 and Firemen Local 6 and report to work. By agreement dated June 18, 1969, with all of the unions * * * except Firemen Local 6, those unions agreed to direct the employees represented by them to cross the picket line of any union picketing the plant premises on or about June 19, 1969, and so directed those employees during the period June 19 to June 24, 1969, while there remained at the plant of Respondent the picket line established and maintained by Firemen and Oilers Local 6. On June 24, 1969, the picket line established and maintained by Firemen and Oilers Local 6 was taken down.

"The picket line set up by IBEW Local 1 and that set up by Firemen and Oilers Local 6 in 1969 were set up notwithstanding Respondent's position that a collective bargaining agreement had been entered into by the certified joint bargaining representative consisting of the five unions * * *. The picket lines of both unions were taken down with the agreement and understanding that as a matter of law and contract the said 5 unions comprise a single bargaining unit of production and maintenance employees (excluding maintenance electrician employees) for purposes of collective bargaining.

"15. In the contract negotiations for the 1972 agreement, the collective bargaining representative * * * presented two composite proposals on behalf of all 5 unions. The first such proposal, dated March 14, 1972, requested that the no-strike provision (Article VIII) be changed to provide that there would be no-strike 'until a grievance has been processed through the third written step' and, further, that the no-strike clause would not apply in the event of certain safety disputes. The second composite proposal, submitted to Respondent on March 27, 1972, repeated the foregoing sought for changes in the no-strike clause and further requested the addition of the following new article, to be numbered Article XXXIII:

In the event that any Union having an Agreement with the Company shall establish a picket line with the authorization of the International of the Union legally representing the picketing employees, the employees of any other Union having an Agreement with the Company may refuse to cross said picket line without violating this Agreement.

"During the 1972 negotiations the Respondent asked the position of the joint representative with respect to the meaning and effect of the proposed new Article XXXIII. It was the position of the joint representative and each of the 5 unions making it up that should any of the 5 unions or any other union set up a picket line at Respondent's plant then employees represented by the 5 unions would be free to respect those picket lines and not come to work, notwithstanding the existence of a contract. It was the Respondent's position that this question of respecting a picket line notwithstanding the existence of a contract had been settled in the way described in paragraph 14 in 1969. The joint representative and representatives of the 5 unions composing it stated that the 1969 agreement was only good for 1969 and it was their position that their members had the

right to respect the picket line of any union, regardless of a contract between the Respondent and the joint representative. On April 28, 1972, Respondent discontinued negotiations with the joint representative and refused to bargain further with the joint representative for the stated reason provided to the joint representative that the positions taken with respect to the picket line issue were contrary to the 1969 agreement. Unfair labor practice charges were filed by Respondent against the joint representative with regard to this asserted refusal to honor the 1969 agreement and unfair labor practice charges were filed by the joint representative against Respondent for breaking off negotiations. In an agreement between Counsel for Respondent and the joint representative, both unfair labor practice charges were withdrawn and the negotiations resumed, resulting in the 1972–1975 contract previously described, without change in the no-strike clause or the addition of Article XXXIII.

"16. In the contract negotiations in 1975, the joint representative proposed union demands under date of March 4, 1975. Including, at page 81, the addition of a new Article XXXIV stating as follows: 'It shall not be a violation of the Agreement and it shall not be cause for discharge or disciplinary action in the event an employee refuses to go through or work behind a picket line at the Plant.' In the discussions concerning the above-quoted proposal, Respondent inquired about the meaning and effect of the proposal and was informed that it was specifically directed to the picket lines of other unions than those comprising the joint representative, whether representing employees of Respondent or other employees. The aforesaid proposed addition to the contract (Article XXXIV) was not included in the 1975–1978 agreement.

"17. The 1975–1978 agreement went into effect on September 22, 1975. On that same date, IBEW Local 1 established a picket line at Respondent's plant on behalf of maintenance electrician employees and directed to supporting IBEW Local 1's contract demands for an agreement covering maintenance electricians. Some employees of Respondent represented by the joint representative did not report for work as scheduled and, although urged to report for work by the joint representative, continued to remain away from work, until the issuance of a temporary restraining order and order to show cause at 5 p. m. on September 22, 1975 in Cause No. 75–842C(1)."

The above Order was premised in part upon a finding that, "[t]he strike activity and attendant work stoppage sought to be enjoined by the instant proceeding derives from grievances which all parties are contractually obligated to resolve in accordance with the grievance and arbitration procedure set out in the collective bargaining agreement between Plaintiff and Defendant Local Unions." *ACF Industries, Inc. v. Brotherhood of Railway Carmen*, Civ.No. 75–842C, slip op. at 2 (E.D.Mo. September 22, 1975). The parties were ordered to submit the matter to arbitration and the employees represented by the union thereupon returned to work. The parties reached a settlement that the complaint would be dismissed and the temporary restraining order dissolved and that there would be no concerted walk out by P & M employees with respect to the 1975 dispute between Amcar and Local 1. The Union waived its right to arbitrate the issue of honoring the Local 1 picket line, but the agreement provided, "[t]his waiver shall not apply to any future Labor dispute between Plaintiff and Defendants." [5]

5. The settlement stated in pertinent part:

3. The parties hereto agree that there shall be no concerted walk out or any other concerted activities by the employees in the Plaintiff's production and maintenance. bargaining unit pertaining to the current labor dispute between Plaintiff and the employees in the Local 1, International Brotherhood of

Electrical Workers electricians maintenance unit.

4. The Defendants herein waive their right to arbitrate the issue of their asserted right to honor the Local 1, International Brotherhood of Electrical Workers picket line. This waiver shall not apply to any fu-

The 1975 contract also included a new absentee and tardiness control program negotiated by Amcar and the Union in response to what both parties agreed was a serious attendance problem at the Amcar plant. Amcar was particularly concerned about high absenteeism on Fridays and Mondays. The Union favored a "mechanical" program which did not give Amcar discretion in excusing absences. This view prevailed. The agreement limited excused absences to funeral leave, jury service, service as a witness, or personal leave of absence with prior company approval. All other absences, without regard to reason, were classified as unexcused. Since the implementation of the program, Amcar has not kept track of the reason for any absence.

The 1975 agreement provided for a graduated series of discipline for those who violated the no absentee provision of the contract. Those employees incurring five or more unexcused absences would receive "counseling" (oral warnings). The next three unexcused absences could also result in warnings, with the fourth resulting in suspension or discharge. Because the Union felt the employees were not "getting the message," the 1978 negotiations resulted in the imposition of a temporary one-week suspension prior to discharge being added to the program.

In 1976, the Absence Control Program with Amcar was subject to a contractual arbitration proceeding when the Union grieved the discharge of an employee who had been discharged for alleged excessive absenteeism. The Union contended absences for legitimate illness or injury are "excused" under the contract, and therefore discharge was not warranted under the circumstances. The arbitrator found no absences were excused under the program except those enumerated and to rule otherwise would be to add terms to the contract, which he as the arbitrator was prohibited from doing. The arbitrator ruled the discharge was for a just and proper cause, and no appeal was taken. The arbitrator's decision thus became the law of the contract. Although there was considerable discussion in the 1975 negotiations concerning what an excused absence might be, there was no discussion with regard to absenteeism due to sympathy strikes.

## II. ANALYSIS

At the threshold it should be noted that neither party challenges the ALJ's decision that deferral to arbitration and grievance procedures was inappropriate in the instant case.

■ Section 7 of the Act generally protects employees who engage in sympathy strikes in support of a lawful, primary strike by another union. *See, e. g., W–I Canteen Service, Inc. v. NLRB*, 606 F.2d 738, 743 (7th Cir. 1979), and cases cited therein. Section 8(a)(1) provides that it is an unfair labor practice for an employer to interfere with section 7 rights. However, in the collective bargaining agreement, employees may waive their right to engage in sympathy strikes. *NLRB v. Rockaway News Supply Co.*, 345 U.S. 71, 80–81, 73 S.Ct. 519, 524–25, 97 L.Ed. 832 (1953); *Delaware Coca-Cola Bottling Co. v. General Teamster Local Union 326*, 624 F.2d 1182, 1185 (3d Cir. 1980). Where there is not an express waiver of this right, the evidence of the waiver must be "clear and unmistakable." *W–I Canteen Service, Inc. v. NLRB, supra*, 606 F.2d at 743. See *NLRB v. Gould, Inc.*, 638 F.2d 159 (10th Cir. 1980).[6]

■ In determining whether there has been a waiver of the right to engage in

ture labor dispute between Plaintiff and Defendant.

6. The Board has followed this analysis in all its recent cases and it is our view that it is the proper approach. *See, e. g., American Cyanamid Co.*, 246 N.L.R.B. No. 17, 102 LRRM 1443 (1979); *Daniel Construction Co.*, 239 N.L.R.B. 1335 (1979); *Local 18, Operating Engineers*

(*Davis-McKee, Inc.* ), 238 N.L.R.B. No. 58, 99 LRRM 1307 (1978); *Keller-Crescent Co.*, 217 N.L.R.B. 685 (1975), *enf. denied*, 538 F.2d 1291 (7th Cir. 1976); *Gary-Hobart Water Corp.*, 210 N.L.R.B. 742 (1974), *enf'd*, 511 F.2d 284 (7th Cir. 1975), *cert. denied*, 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1976).

sympathy strikes, the collective bargaining agreement must be interpreted as a whole and in light of the law relating to it when made. *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 279, 76 S.Ct. 349, 356, 100 L.Ed. 309 (1956); *Delaware Coca-Cola Bottling Co. v. General Teamster Local Union 326, supra*, 624 F.2d at 1184; *W–I Canteen Service, Inc. v. NLRB, supra*, 606 F.2d at 745. The collective bargaining agreement in the instant case contains an express no-strike provision. There are a number of relevant facts to examine in determining whether the Union intended to waive its right to engage in sympathy strikes. We look to the language of the contract, the structure of the contract, the bargaining history, and any other relevant conduct of the parties that shows their understanding of the contract. *Delaware Coca-Cola Bottling Co. v. General Teamster Local Union 326, supra*, 624 F.2d at 1185; *Iowa Beef Processors, Inc. v. Amalgamated Meat Cutters*, 597 F.2d 1138, 1144 (8th Cir. 1979), *cert. denied*, 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1980). *See W–I Canteen Service, Inc. v. NLRB, supra*, 606 F.2d at 745; *NLRB v. Keller-Crescent Co.*, 538 F.2d 1291, 1296 (7th Cir. 1976), *enf'g*, 217 N.L.R.B. 685 (1975); *Montana-Dakota Utilities Co. v. NLRB*, 455 F.2d 1088, 1091–92 (8th Cir. 1972).

 The contract's no-strike clause provides, "[d]uring the term of this Agreement there shall be no lock out, strike, stoppage of work or slow down." In our view, this is insufficient, in and of itself, to constitute a waiver of the right to engage in sympathy strikes. *See Mastro Plastics Corp. v. NLRB, supra*, 350 U.S. at 283–84, 76 S.Ct. at 358. However, a number of cases have interpreted general no-strike clauses to preclude sympathy strikes. *See W–I Canteen Service, Inc. v. NLRB, supra*, 606 F.2d at 745, and cases cited therein. The broad language of this no-strike clause, when examined in light of the bargaining history, the existence of the Absence Control Program, and the facts surrounding the parties' actions at issue here, indicate a clear waiver of the Union's right to engage in a sympathy strike.

## A. Bargaining History of the No-Strike Clause

The no-strike clause has remained unchanged since its adoption in 1969, despite attempts by the Union to amend it. The signing of that contract in 1969, was followed by picketing on behalf of two of the five amalgamated unions. The dispute was caused by the view of the striking unions that they were not part of the single bargaining unit. The dispute was settled by an agreement recognizing the five jointly certified unions as a single unit of production and maintenance employees and the Union directed its members to cross the picket line of any union picketing the Amcar plant on or about June 19, 1969.

During the 1972 negotiations, the Union indicated that its agreement in 1969 to cross picket lines was effective only from 1969 through 1972. In 1972, the Union then sought to include a provision in the agreement giving it the right to refuse to cross lawful picket lines, which would have included the right to take part in sympathy strikes. Negotiations were broken off by Amcar who filed unfair labor practice charges, and the Union then filed similar charges for breaking off negotiations. A settlement was reached omitting the disputed provision from the agreement and retaining the same no-strike provision. While sympathy strikes were not the focal point of the 1972 negotiations, the right to engage in such activity was included in the proposal submitted by the Union. Prior Supreme Court and Board decisions have stated that an attempt by the Union to add such a provision is significant in inferring that the Union was waiving its right to engage in sympathy strikes. *NLRB v. Rockaway News Supply Co., Inc., supra*, 345 U.S. at 79–80, 73 S.Ct. at 524; *The Hearst Corp.*, 161 N.L.R.B. 1405, 1416 (1966), *enf'd sub. nom., News Union of Baltimore v. NLRB*, 393 F.2d 673 (D.C.Cir.1968). *See Gary-Hobart Water Corp.*, 210 N.L.R.B. 742 (1974), *enf'd*, 511 F.2d 284 (7th Cir. 1975), *cert. denied*, 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1976) (Board applied same

analysis when it was employer who had unsuccessfully sought to insert provisions regarding sympathy strikes into agreement).

The Board contends that the action by the Union in 1972 should not have the same effect as it did in *Rockaway News* and *Hearst* because the attempt to amend was not contemporaneous with the origin of the no-strike provision. It argues another possible inference is that the Union was attempting to get in express writing that which it felt the contract already provided. Additionally the Board relies on *Local 18, Operating Engineers (Davis-McKee Inc.)*, 238 N.L.R.B. 652 (1978), and *Keller-Crescent Co.*, 217 N.L.R.B. 685 (1975), for the proposition that the parties must discuss the issue of sympathy strikes before waiver can be found. In the instant case the parties were aware that the discussed proposal included sympathy strikes, although this was not the focus of the proposal.

The Board's interpretation becomes less tenable when considered in light of the negotiations for the 1975 contract. The Board's conclusion that "this was really the first direct proposal between the parties in the matter" is not correct. As previously stated, in 1972 the parties discussed the point that the deleted provision would have allowed the union to engage in strikes against any union, although sympathy strikes were not the central point to the negotiations. The Union's action in 1975— again making an express written proposal which would allow for sympathy strikes— together with the facts that the 1975 proposal was discussed by the parties, opposed by Amcar, and not included in the agreement, takes on added significance. It is much less likely the Union was still attempting to "clarify" the contract.

**B. *The 1975 Sympathy Strike***

Other extrinsic evidence supports a conclusion that the Union waived its right to engage in sympathy strikes at the Amcar plant in the 1975 agreement. The P & M unit and Amcar reached agreement and their contract went into effect in September 1975. On the same date the agreement went into effect, Local 1 went on strike. These activities parallel the 1978 controversy. In 1975, some of the P & M unit employees respected the picket line, although *urged* to report by the Union's joint representative.

Amcar obtained a temporary restraining order, entered by the United States District Court for the Eastern District of Missouri. The Order directed the P & M unit to return to work and required the matter to be set for arbitration. The parties reached an agreement and did not arbitrate the dispute. The agreement provided, in relevant part, that P & M unit employees waived "the right to arbitrate the issue of their asserted right to honor the Local 1 * * picket line." It was expressly provided this waiver did not apply to any future labor disputes between Amcar and the Union.[7]

Amcar argues that this episode clearly demonstrates the Union's belief that it had waived the right to engage in sympathy strikes, otherwise the joint representative would never have *urged* the P & M unit employees to cross the Local 1 picket line. The Board stated that there might be "other reasonable explanations" for this action by the Union, that the Union "may have believed that the maintenance electricians were capable of obtaining their contract demands through economic pressure without the need for additional assistance from other union employees." There is no support in the record for such speculation, and it is unlikely that thirty-five Local 1 employees would not need the support of the

7. *See* note 5 and accompanying text *supra.* The Union's reservation of its right to arbitrate the agreement does not indicate that it believed it possessed the right to engage in sympathy strikes. The Union did not arbitrate at this time nor has it sought arbitration since. As noted by the ALJ, "if the Union adhered to the view that unit employees could honor maintenance electrician picket lines, then it is difficult to see why the Union would avoid the arbitration directed by the Court and choose instead to go through the same problem again at a future date."

large P & M unit. *See Acme Products, Inc. v. NLRB,* 389 F.2d 104, 106 (8th Cir. 1968).[8]

### C. *The Absence Control Program*

A clear indication that the Union had waived its right to engage in sympathy strikes is further evidenced by the presence of the Absence Control Program in the 1975 collective bargaining agreement. This is a mechanical program excusing absences in only four enumerated situations,[9] and making no reference to sympathy strikes or picket lines. The parties arbitrated the meaning of the program in 1976, and the arbitrator ruled that these four reasons were the only excuses provided for and any other excuses could be achieved only by amendment. The Union did not grieve the arbitrator's decision. In the 1978 negotiations, the Union did not attempt to include sympathy strikes as an exception to the "Absence Control Program," nor did they attempt to amend the no-strike clause in these negotiations to allow for sympathy strikes.

The Board argues the no-strike clause and the Absence Control Program were separately negotiated and the parties were not thinking of the issue of sympathy strikes when they negotiated the Absence Control Program and vice versa. In interpreting a collective bargaining agreement, however, we must construe the contract as a whole. *Mastro Plastics Corp. v. NLRB, supra,* 350 U.S. at 279, 76 S.Ct. at 356. While it is possible that the Union made no connection between the two issues, the joint representatives are experienced negotiators and the more reasonable inference is that made by the ALJ, who stated that "the absentee program, as incorporated into the contract is inconsistent with an interpreta-

tion that the production and maintenance employees were free to cross the Union's picket lines at the plant without being counted absent."

### D. *Action Surrounding the 1978 Strike*

Finally, a clear and convincing waiver is evidenced by the parties' actions in response to the picket line set up by Local 1 in 1978. The chief negotiator for the joint representative, James Johnson, told the company the notice given by Amcar "was accurate." Counsel for the joint representative, Charles Werner, said that the P & M unit employees should cross the picket line. The notice stated, *inter alia,* "[a]ny employee who refuses to report to his job may be considered to be in violation of the no-strike clause and will be considered as absent."

We disagree with the Board's conclusion that this action was not significant. The Board argues that there was no evidence that Johnson and Werner had negotiated the original no-strike clause and therefore their opinions could not be attributed to the Union as a whole. Whether speaking as individuals or in their official capacities, however, the views of the people who have just negotiated the collective bargaining agreement then in effect is more important than what the original drafters of the 1969 no-strike clause may have intended. There is a strong inference of waiver considering that it is unlikely Union negotiators would lightly presume they had waived the right to engage in sympathy strikes. *See News Union of Baltimore v. NLRB, supra,* 393 F.2d at 678. As stated by the ALJ:

> If the Union believed that notwithstanding the no-strike clause, unit employees could honor the 1978 IBEW picket line without being charged with an unexcused

---

**8.** "The Board is entitled to draw reasonable inferences from the evidence but some substantial evidentiary basis must exist to support the inferences drawn. Inferences cannot be based purely on speculation." *Acme Products, Inc. v. NLRB,* 389 F.2d 104, 106 (8th Cir. 1968).

That court also made the following observation related to our standard of review. "[I]n resolving the crucial issue of whether the Board's determination is based upon substantial evidence on the record considered as a

whole, the Trial Examiner's findings which turn on credibility determinations with respect to witnesses whom he alone saw and heard, are entitled to considerable weight." *Id. See also Cartwright Hardware Co., Inc. v. NLRB,* 600 F.2d 268, 270 (10th Cir. 1979) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951)).

**9.** *See* page 11 *supra.*

absence, then it may reasonably be inferred that the Union would have advised employees who wished to honor the picket line to notify the Company of the reason for their absence, in order to preserve the rights of the employees in an arbitration or litigation. However, the Union did not do this. * * * [T]he Union took no action in contradiction of [the notice]. The Union did not file any grievances in the matter, nor did it file or join in the present unfair labor practice charge. Instead, the Union's representative sat in silence at the rear of the hearing room, while Company official Allen testified concerning the Union's stated position.

### E. *Amcar's Other Contentions*

Amcar also alleges that the Board's petition for enforcement should be denied for the reason that Amcar had no knowledge that any of its employees were engaged in sympathy strike activities. Our finding of waiver obviates the necessity of reaching this or other points alleged as error by Amcar.[10]

### III. CONCLUSION

On the basis of the foregoing discussion, we conclude that the substantial evidence did not support the Board's conclusion in the instant case that the Union maintained its right to engage in sympathy strikes. While none of the evidence alone—the broad no-strike clause, the Absence Control Program, the evidence of the bargaining history, or the other evidence extrinsic to the contract—may clearly show a waiver, taken together we agree with the dissenting Board member and the ALJ that the evidence demonstrates an unmistakable waiver of the employees' right to engage in sympathy strikes. Amcar was therefore entitled to take disciplinary action in accordance with the Absence Control Program in the collective bargaining agreement.

The petition for enforcement of the Board's order is denied in its entirety.

10. We note that the dissenting member of the Board relied on the opinion of the ALJ only with regard to the waiver question.