**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**C. K. SMITH & CO., INC.,**

and

**Buckley Heating Co., Inc., (Gasoline
Division), Respondents.**

No. 77–1152.

United States Court of Appeals,
First Circuit.

Argued Sept. 13, 1977.

Decided Dec. 28, 1977.

Paul J. Kingston, Boston, Mass., with whom Robert W. Garrett, Paul V. Mulkern, Jr., and Thompson & Kingston, Boston Mass., were on brief, for respondents.

Before COFFIN, Chief Judge, TUTTLE, Circuit Judge,* CAMPBELL, Circuit Judge.

LEVIN H. CAMPBELL, Circuit Judge.

The National Labor Relations Board petitions for enforcement of an order that requires, inter alia, that respondents C. K. Smith & Co. and Buckley Heating Co. cease and desist from committing certain unfair labor practices and reinstate employees who were replaced during a strike at the companies' common premises.

The Board's order is premised on a finding that the respondents, though separately incorporated, constitute a single "employer" within the meaning of the Act, with each corporation thus responsible for the other's unfair labor practices and with the employees of each commonly protected. We turn first to the companies' challenge to the Board's resolution of this threshold question.

The Administrative Law Judge (hereinafter ALJ), whose findings the Board adopted, found that both corporations are commonly owned and share the same premises in Worcester, Massachusetts, where they have their offices and conduct their business. Both corporations are engaged in the "sale and distribution of . . . oil and related products" with Smith engaged in the retail end of the business and Buckley engaged in wholesale sales. The daily operations and labor relations of both companies are managed by the same people who hold the same offices in both firms. The ALJ also found that "in the handling of labor relations matters for one Respondent, concern is given for the effect of such labor relations on the other Respondent."

Michael S. Winer, Atty., Washington, D. C., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Judith P. Wilkenfield, Atty., Washington, D. C., were on brief, for petitioner.

■ The Supreme Court has said that, for purposes of determining "single employer" status,

* Of the Fifth Circuit, sitting by designation.

"[t]he controlling criteria, set out and elaborated in Board decisions, are interrelation of operations, common management, centralized control of labor relations and common ownership."

*Radio Technicians Local 1264 v. Broadcast Service of Mobile, Inc.,* 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965). *See, e. g., Western Union Corp.,* 224 N.L.R.B. 274, 276 (1976); *Sakrete of Northern California, Inc.,* 137 N.L.R.B. 1220, 1222 (1962), *enforced,* 332 F.2d 902 (9th Cir. 1964). *See also South Prairie Construction Co. v. Operating Engineers Local 67,* 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1975). The Board's conclusion that two corporations constitute a "single employer" is "essentially a factual one" and not to be disturbed provided substantial evidence in the record supports the Board's findings. *NLRB v. R. L. Sweet Lumber Co.,* 515 F.2d 785, 793 (10th Cir.), *cert. denied,* 423 U.S. 986, 96 S.Ct. 393, 46 L.Ed.2d 302 (1975). *Accord, Newspaper Production Co. v. NLRB,* 503 F.2d 821, 827 (5th Cir. 1974).

■ Respondents do not contest the findings of common ownership, common management and common control of labor relations. Rather they cite various factors which, they say, show that the two firms' operations are not integrated, such as the existence of separate bargaining units and a lack of evidence showing combined accounting records and bank accounts. But there was sufficient other evidence for the Board to find a unified operation. The sharing of common premises is a factor probative of integrated operations. *Marine Welding & Repair Works, Inc. v. NLRB,* 439 F.2d 395, 397 (8th Cir. 1971); *NLRB v. Jordan Bus Co.,* 380 F.2d 219, 222 (10th Cir. 1967). The sale of essentially similar products via similar distribution methods is also probative of integration. *See Sakrete of Northern California, Inc., supra,* 332 F.2d at 906. And, while the Board's General Counsel had the burden of proving integrated operations, the ALJ could take into account that respondents had primary access to whatever evidence might exist to refute the claim. Not only did they fail to produce

evidence capable of rebutting the inferences to be drawn from the evidence introduced by the General Counsel, but, the ALJ noted, their attorney had even retreated without explanation from an earlier agreement to stipulate to facts that might be material to the single employer issue. We find ample basis for the conclusion that "the facts reveal in effect one enterprise with divisions of the same engaged in 'wholesale' and 'retail' distribution of oil and related products."

On the premise, therefore, that the two firms constituted one employer, we turn to the unfair labor practices alleged. During March and April 1974, Buckley had a collective bargaining relationship with Teamsters Local 170, representing about twelve wholesale drivers. Smith had a bargaining relationship with the same union representing a unit made up of its three retail drivers. And, in March 1974, the six employees in what is termed the "Smith mechanics unit" began organizing in league with Local 170. In findings that are not appealed, the Board found that in the spring of 1974 Smith's president violated § 8(a)(5) & (1) by bargaining individually with retail drivers unit employees during contract negotiations with the union. The Board also found that Smith's officials coercively interrogated and threatened mechanics unit employees during the union organizing campaign. It was also found that the employer had recognized the union as the mechanics' bargaining agent and then had unlawfully withdrawn recognition.

■ On April 29, 1974, the wholesale. drivers, the retail drivers and the mechanics "ceased work concertedly and went out on strike." The strike lasted until July 8. The mechanics led the walkout, having voted to strike after learning of Smith's withdrawal of recognition. The retail drivers, the ALJ found,

"struck in support of the 'mechanics' who were engaged in an unfair labor practice strike and because of a belief that the Respondents would not negotiate as to

the 'retail drivers' contract as long as there was trouble with the mechanics."

The ALJ went on to state,

"The only evidence, other than the facts previously set forth, relating to the motivation for the striking activities of the Buckley wholesale drivers on April 29, 1974, through July 8, 1974, consists of the Union's filing of an unfair labor practice charge contending · that such employees were 'locked out,' Gentile's testimonial denial in effect that such employees were 'striking,' and Gentile's testimony to the effect that such employees in effect honored the picket line."

The ALJ and the Board, concluded,

"In sum, the evidence . . . reveals that the 'wholesale drivers' struck in sympathy with the 'mechanics' unit employees in an unfair labor practice strike."

The Local's representative, Gentile, repeatedly testified that the reason the wholesale drivers did not work on April 29 was their refusal to cross the mechanics' picket line. This testimony, together with the common locus and employment, the fact that the same local represented the two dozen men in the three bargaining units, and the concerted timing of the wholesale drivers' action, which began and ended at the same time as the mechanics' strike, entitled the Board to infer that the wholesale drivers "struck in sympathy" with the mechanics. Indeed, no other explanation can easily be imagined. We see no merit in the employer's claim that there was no causal nexus between the unfair labor practices committed against the mechanics and the wholesale drivers' strike. To be sure, the business agent of Local 170 testified, perhaps disingenuously, that the wholesale drivers were not "striking" at all but were simply observing the other bargaining unit's picket line. On these facts, the distinction is without a difference; however the wholesale drivers' walkout is characterized, the inference that it amounted to a sympathy strike, maintained in support of the mechanics' grievances, is reasonable.

█ Even so assuming, however, the respondents maintain that the Board erred in conferring unfair labor practice status on the wholesale drivers, and in ordering their reinstatement irrespective of whether the employer had replaced them out of economic necessity. They contend that a sympathy strike is unprotected by § 7.[1] But the sympathy strike here was by employees of a common employer. Such a strike by employees against a common employer and in support of coworkers is "concerted activit[y] for . . . mutual aid or protection". See Newspaper Production Co., supra, 503 F.2d at 830; General Tire & Rubber Co. v. NLRB, 451 F.2d 257, 258 (1st Cir. 1971); NLRB v. Union Carbide Corp., 440 F.2d 54, 55–56 (4th Cir.), cert. denied, 404 U.S. 826, 92 S.Ct. 58, 30 L.Ed.2d 55 (1971); NLRB v. Difco Laboratories, Inc., 427 F.2d 170, 171–72 (6th Cir.), cert. denied, 400 U.S. 833, 91 S.Ct. 66, 27 L.Ed.2d 65 (1970); NLRB v. Southern Greyhound Lines, 426 F.2d 1299, 1301 (5th Cir. 1970). And it has been the Board's policy that where such a sympathy striker supports an unfair labor practice strike against a common employer, the sympathy striker enjoys the same reinstatement rights as the primary striker. Pilot Freight Carriers, Inc., 224 N.L.R.B. 341, 342 (1976); Hoffman Beverage Co., 163 N.L.R.B. 981, 982 (1967).

█ In determining whether striking employees are entitled to reinstatement, the Board's duty is to balance their interests in the free exercise of their § 7 right against the employer's legitimate business reasons

---

1. The employer's reliance on Montana-Dakota Utilities Co. v. NLRB, 455 F.2d 1088 (8th Cir. 1972) and NLRB v. L. G. Everist, Inc., 334 F.2d 312 (8th Cir. 1964), is misplaced. Both cases involved employees' honoring stranger unions' picket lines at another employer's premises. Such conduct is arguably unprotected by § 7 inasmuch as the disciplined employees' self-interest is not directly or indirectly implicated in the primary strike. See NLRB v. Union Carbide Corp., 440 F.2d 54, 55 (4th Cir.), cert. denied, 404 U.S. 826, 92 S.Ct. 58, 30 L.Ed.2d 55 (1971). But see NLRB v. Peter Cailler Kohler Swiss Chocolates Co., 130 F.2d 503, 506 (2d Cir. 1942) (L. Hand, J.). The type of sympathy strike involved in the present case is clearly protected by § 7.

for replacing them. It is primarily the Board's not the courts' responsibility "to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy." *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, 88 S.Ct. 543, 546, 19 L.Ed.2d 614 (1967), *quoting NLRB v. Great Dane Trailers*, 388 U.S. 26, 33–34, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); *accord Hudgens v. NLRB*, 424 U.S. 507, 521–23, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976); *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 229, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963); *Union Carbide Corp., supra*, 440 F.2d at 57; *NLRB v. Alamo Express, Inc.*, 430 F.2d 1032, 1036 (5th Cir. 1970), *cert. denied*, 400 U.S. 1021, 91 S.Ct. 584, 27 L.Ed.2d 633 (1971).

Circuit courts have upheld the reinstatement of economic sympathy strikers where the striker

"has in effect plighted his troth with the [other] strikers, joined in their common cause, and has thus become a striker himself. . . . The basis of the protection against discharge afforded an employee who refuses to cross a picket line at his employer's business is his status as a striker. Such an employee is therefore entitled to all the protection due under the National Labor Relations Act to those strikers with whom he has joined cause."

*Southern Greyhound Lines, supra*, 426 F.2d at 1301; *accord, Newspaper Production Co., supra*, 503 F.2d at 830. *See, e. g., General Tire & Rubber Co., supra*. While we have found no similar court decisions dealing with the reinstatement rights of unfair labor practice sympathy strikers, we have no reason to suppose that the Board has not struck a "proper balance between the asserted business justification and the invasion of employee rights" in extending the Act's protection to such strikers. *See Pilot Freight Carriers, supra; Hoffman Beverage Co., supra*.

The preferential reinstatement rights accorded unfair labor practice strikers may cause some disruption to an employer which has replaced all or some of them. But the sympathy striker resisting unfair labor practices may also have more at stake than in the economic strike situation. An employer's attempted ouster of the union in one bargaining unit could have deleterious effects on the union's prestige and the stability of collective bargaining throughout the plant. Such misconduct might be thought to thwart the Act's central policy of "inaugurating regimes of industrial peace," *Linden Lumber Division, Summer & Co. v. NLRB*, 419 U.S. 301, 307, 95 S.Ct. 429, 42 L.Ed.2d 465 (1974), and is of considerably greater moment to affected employees than the issues typically at stake in an economic strike. And, since sympathy strikers stand in the shoes of primary strikers for purposes of lawful discipline and replacement, it seems equitable to afford them preferential reinstatement rights where such rights are granted primary strikers. We conclude, therefore, that the Board has not exceeded its authority in providing the same reinstatement rights to unfair labor practice sympathy strikers in a situation of common employment as are afforded to primary strikers.

The employer's most substantial argument is that reinstatement should not be ordered because the wholesale drivers struck in violation of a "no strike" clause in their contract. The "no strike" clause is contained in the section of the contract entitled "Grievance Procedure" which defines a "grievance" as "any controversy, complaint, misunderstanding or dispute . . . arising between the Company and the Union or an employee represented by the Union". The contract provides that any "grievance" will be subject to a three-step procedure, from shop steward to arbitrator. It further provides,

"If the Company fails to comply with the award of the Arbitrator or with the procedures of this Article, the Union has a right to take all legal and economic action to enforce compliance.

". . . There shall be no strike, work stoppage or interruption of work during the term of this Agreement unless the Company shall refuse to comply with an arbitration award pursuant to arbitration

proceedings instituted in accordance with the terms of this Article."

■ In deciding whether this portion of the contract prohibits the sympathy strike at issue here, we begin with the holding in *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 281, 76 S.Ct. 349, 357, 100 L.Ed. 309 (1956), that a similar no-strike clause was not to be given a literal interpretation but was to be read in the context of the whole contract and in "light of the law under which the contract was made." The Court has also stated that it is appropriate for the Board to interpret contract terms when necessary to its role of enforcing the Act. *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 428–29, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967). If the Board's interpretation has a reasonable basis in the contract terms, the Act's policies and the Board's expertise, it is entitled to deference. *See id.* at 430–31, 87 S.Ct. 559; *Newspaper Production Co., supra*, 503 F.2d at 830.

■ In the present case, the Board's interpretation finds support in several rationales. In *Mastro Plastics Corp., supra*, employees protesting the employer's illegal attempted ouster of their union as collective bargaining representative ostensibly violated the broad "no strike" clause. The Supreme Court noted that the "no strike" pledge was to be read in the context of a contract which "assume[d] the existence of a lawfully designated bargaining representative" and was plainly "aimed at avoiding interruptions of production prompted by efforts to change existing economic relationships." 350 U.S. at 282, 76 S.Ct. at 358. Viewing the "no strike" clause, in context, as logically limited to stoppages over economic issues properly the subject of collective bargaining or arbitration, the Court held that there was "no adequate basis for implying [the] existence" of a waiver of the right to strike over unfair labor practices undermining the collective bargaining relationship. *Id.* at 283, 76 S.Ct. at 358. Later circuit cases have held that waivers of the right to strike against unfair labor practices must be in "clear and unmistakable language." *Newspaper Production Co., supra*, 503 F.2d at 830; *Kellogg Co. v. NLRB*, 457 F.2d 519, 525 (6th Cir.), *cert. denied*, 409 U.S. 850, 93 S.Ct. 58, 34 L.Ed.2d 92 (1972). There is in the present "no strike" clause and contract no such clear and unmistakable waiver.

The present case is, to be sure, distinguishable from *Mastro Plastics* in that here the employer's unfair labor practices were destructive of the union's status only in another bargaining unit. Nevertheless, the right to engage in an unfair labor practice sympathy strike is protected under § 7; waiver of the right is not lightly to be inferred. And the wholesale drivers' contract containing the "no strike" clause plainly does not contemplate processing the mechanics' grievance through the wholesale drivers' arbitration machinery. *See Buffalo Forge Co. v. Steelworkers*, 428 U.S. 397, 407–08, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). There is thus a close parallel between this case and *Mastro Plastics*.[2]

**2.** *NLRB v. Rockaway News Supply Co.*, 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953), relied on by the employer, is not controlling. That case not only preceded *Mastro Plastics* but also involved an employee's refusal to cross a stranger union's picket line at another employer's plant. Such a "sympathy strike" is of considerably less importance under the Act than one directed at a common employer and provoked by serious unfair labor practices. See note 1 *supra*.

We ascribe little weight to the employer's argument that the bargaining history behind the "no strike" clause reveals that the union was waiving its right to strike even over serious unfair labor practices directed at another bargaining unit at the employer's plant. It is true that the union was unable to obtain the employer's assent to a contract containing a broadly phrased "preservation of rights" clause which would have permitted the union to honor sister locals' picket lines at the company's and other employers' premises. The inference to be drawn, however, is not that the union thereby agreed to incorporate the converse in the "no strike" clause. The more reasonable interpretation is that the parties left the "no strike" clause to be interpreted according to the existing principles of law in this area, with the union free to engage in a sympathy strike against unfair labor practices committed by the employer but barred from honoring picket lines at another employer's plant. *Compare Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 76 S.Ct.

■ By the same token, the Board's interpretation of the "no strike" clause is supportable in light of the familiar principle that a no-strike provision is ordinarily coterminous with the duty to arbitrate. *E. g., Gateway Coal Co. v. UMW*, 414 U.S. 368, 382, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974); *Gary Hobart Water Corp. v. NLRB*, 511 F.2d 284, 287 (7th Cir.), *cert. denied*, 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1975). Since the dispute underlying the work stoppage—that between the mechanics and the employer—could not be processed through the wholesale drivers' grievance machinery, there was no duty to arbitrate, and the "no strike" clause did not bar the sympathy strike.

The employer, however, argues that the wholesale drivers violated their contract since the applicability of the "no strike" clause to the wholesale drivers' sympathy walkout is itself an arbitrable issue. In *Buffalo Forge Co., supra*, at 405, 96 S.Ct. 3141, it was recognized that the scope of such pledges may itself present an arbitrable question. However, it does not follow that the application of the clause in the present case was arbitrable. The contract between Buckley and the wholesale drivers provides that the arbitration machinery may be activated where the "aggrieved employee or employees" first "present the grievance to the Shop Steward within five (5) working days after the reason for the grievance has occurred . . . ." The contract then provides steps for further processing of the grievance, culminating in arbitration.. Nowhere in the "Grievance Procedure" section of the contract containing the "no strike" clause is there provision

for employer initiation of grievance procedures or arbitration. *Compare Buffalo Forge Co., supra* at 400 & n.2, 96 S.Ct. 3141. Since the claimed violation of the "no strike" pledge is itself the employer's rather than the union's grievance, and since no provision is made for arbitration of such a "grievance", we have some difficulty seeing how the union violated an implicit or explicit pledge to arbitrate this issue.[3] And, on the merits, it seems unlikely that an arbitrator, even if he took jurisdiction, would construe the "no strike" clause in a manner different from the Board's interpretation in this case. There is no "picket line" clause, *see NLRB v. Keller-Crescent Co.*, 538 F.2d 1291 (7th Cir. 1976), and neither the law nor the bargaining history provides significant support for an interpretation of the clause barring the sympathy strike at issue here.

■ A court, to be sure, cannot confidently predict how an arbitrator might see these matters, although we believe it our duty to make a threshold determination in these circumstances, *Mastro Plastics Corp. v. NLRB, supra; NLRB v. C & C Plywood Corp., supra*. But even assuming that the scope of the "no strike" clause were arbitrable, we do not think that the employer is in a good position to complain that the issue was not arbitrated. The company points to nowhere in the record, and we have discovered none, where evidence indicates that the employer called to the union's attention the breach of its "no strike" pledge or demanded arbitration on this issue. As noted above, existing law holds the type of sympathy strike involved here not a violation of a broad "no strike" promise and there is

349, 100 L.Ed. 309 (1956), *with Rockaway News Supply Co., supra*. Nor does the ambiguous testimony of the union business agent, cited by the employer, require a different interpretation. "Where a provision would normally be implied in an agreement by operation of the Act itself . . . we think a waiver should be express, and that a mere inference, no matter how strong, should be insufficient." *NLRB v. Perkins Machine Co.*, 326 F.2d 488, 489 (1st Cir. 1964). Not only was there no express waiver in this case, but the inferences supporting the employer's position are inconclusive.

3. The majority and the dissenters in *Buffalo Forge Co. v. Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), appear to agree that it is appropriate for federal courts in the first instance to determine whether "the strike was . . . *over* any dispute between the Union and the employer that was even remotely subject to the arbitration provisions of the contract." *Id.* at 407, 96 S.Ct. at 3147 (opinion of the Court); *see id.* at 431, 96 S.Ct. 3141 (Stevens, J., dissenting). It is also competent in this case for the Board and the court to perform a similar function with respect to the contract at issue here.

nothing in the bargaining history or terms of the contract to put the union on notice that a different interpretation could be placed on the clause. *Compare NLRB v. Keller-Crescent Co., supra.* In these circumstances, it is hardly equitable for the employer to play dog in the manger: the company itself should have recognized and raised the arbitrability issue at the appropriate time if it later wished to argue the lack of arbitration as a ground for refusing to rehire the strikers.

Finally, assuming again that the scope of the "no strike" pledge was arbitrable, it is by no means clear (although we do not decide the point) that the union was under a duty not to strike pending resolution of the question by an arbitrator. In *Buffalo Forge* the Supreme Court noted that a "no strike" pledge would be implied only with respect to issues "over" which a union had agreed to arbitrate. 428 U.S. at 407, 96 S.Ct. 3141. And the Court stated further that an injunction against a strike in violation of such a pledge would ordinarily be appropriate to protect the employer's quid pro quo and the arbitral process itself. Since the Court in *Buffalo Forge* barred an injunction against a sympathy strike even where the scope of the "no strike" clause was itself concededly arbitrable, it is questionable whether the union could be said to have impliedly agreed not to strike pending arbitral resolution of the scope of the "no strike" clause.

We have examined the other points raised by the employer and find them to be without merit.

*Enforcement granted.*