646 F.2d 1352
 107 L.R.R.M. (BNA) 2667, 91 Lab.Cas. P 12,797
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
and
Local Union No. 47, International Brotherhood of Electrical
Workers, AFL-CIO, Intervenor,
v.
SOUTHERN CALIFORNIA EDISON COMPANY, Respondent.
 No. 79-7435.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 2, 1980.
Decided June 1, 1981.
 
 Paul J. Spielberg, Washington, D. C., for petitioner.
 William Z. Carr, Jr., Los Angeles, Cal., for respondent.
 On Application for Enforcement of an Order of the National Labor Relations Board.
 Before MARKEY,* Chief Judge, WALLACE and SKOPIL, Circuit Judges.
 SKOPIL, Circuit Judge.
 
 INTRODUCTION
 
 1
 The National Labor Relations Board ("the Board") seeks enforcement of its order, 243 NLRB No. 62 (1979), holding that Southern California Edison Company ("SCE") violated sections 8(a)(1) and (3) of the National Labor Relations Act ("the Act"), 29 U.S.C. §§ 151 et seq., by threatening to discipline employees who honored a lawful picket line established by another union representing SCE employees, and by disciplining an employee who refused to cross a lawful picket line at a customer's place of business. The Board rejected SCE's primary defense that the union waived the employees' right to engage in sympathy strikes by accepting a no-strike pledge in the collective bargaining agreement.
 
 
 2
 We must decide whether the Board's interpretation of the Act to protect employees who refuse to cross lawful picket lines is reasonably defensible. If such action is protected, we must determine whether the Board permissibly concluded that the protection was not waived by the parties' collective bargaining contract. If the protection was not waived, we must examine the Board's finding that SCE did not have legitimate business justifications for its actions.
 
 FACTS
 
 3
 SCE is a public utility engaged in transmitting and selling electric power in California and Nevada. It serves millions of customers including several hundred thousand commercial and industrial establishments.
 
 
 4
 At the time of the alleged violations, SCE employed 13,318 people. The intervenor in this case, Local 47, International Brotherhood of Electrical Workers ("IBEW" or "the union") represented 6,754 employees. Local 246, Utility Workers Union of America ("UWUA") represented 1,265. SCE has had successive collective bargaining agreements with IBEW since 1945, and with UWUA since 1947.
 
 
 5
 A. Collective Bargaining History.
 
 
 6
 The first contract between IBEW and SCE was entered into in 1945 and provided inter alia:
 
 ARTICLE I
 RECOGNITION
 
 7
 B. The Company agrees to recognize the rights of employees as set forth in Section 7 of the National Labor Relations Act
 
 ARTICLE II
 CONTINUITY OF SERVICE TO THE PUBLIC
 
 8
 A. It is recognized that the Company is engaged in rendering a public service and is under the duty to the public of operating and maintaining its services subject to the rules, regulations, and orders of the California State Railroad Commission, and, therefore, nothing contained in this agreement shall be construed to conflict or be inconsistent or incompatible with such rules, regulations, and orders.
 
 
 9
 B. Neither the Union nor its officers or agents while this contract is in effect shall call or engage in, sanction or assist in a strike against or any slow-down or stoppage, in whole or in part, of the work or operations of the Company, and while this agreement is in effect the Company shall not cause or permit any lockout of employees.
 
 ARTICLE IV
 GRIEVANCE PROCEDURE
 
 10
 A. In the event any grievance arises concerning a claim by an employee or a group of employees or the union that any of the terms of this Agreement have been violated, or any other grievance relating to rates of pay, wages, hours of employment, or other conditions of employment, such matters shall be adjusted according to the following (grievance) procedure:
 
 ARTICLE V
 ARBITRATION
 
 11
 A. It is agreed that only grievances involving the interpretation or application of this Agreement may be submitted to arbitration
 
 
 12
 B. If the contention is made that the grievance is not a proper one for arbitration as defined in Section A of this Article V, said question of jurisdiction shall be determined by the (Arbitration) Board.
 
 ARTICLE VI
 MANAGEMENT PREROGATIVES
 
 13
 A. The Company has and will retain the right and power to manage the plant and direct the working forces, including the right to hire, to suspend, or discharge for just cause, to promote, demote, and transfer its employees, subject to the provisions of this Agreement. Any claim that the Company has exercised such right and power contrary to the provisions of the Agreement may be taken as a grievance
 
 ARTICLE VIII
 WAIVERS
 
 14
 The Waiver of any breach or condition of this Agreement by either party does not constitute a precedent for any further waiver of such breach or condition.
 
 
 15
 The union's proposals in the 1948 negotiations led to the following modifications of the collective bargaining agreement:
 
 ARTICLE I
 RECOGNITION
 
 16
 B. The Company agrees to recognize the rights of employees as set forth in Section 7 of the National Labor Relations Act The Company or the Union will not interfere with, restrain or coerce the employees in the exercise of their rights as set forth in the National Labor Relations Act or any amendments thereto.
 
 ARTICLE II
 CONTINUITY OF SERVICE TO THE PUBLIC
 
 17
 A. It is agreed that there shall be no strike, slow-down, or lockout until all methods provided for the settlement of disputes in this agreement have been fully utilized, and further, that the parties shall have exhausted the remedies provided under the Labor-Management Relations Act.
 
 
 18
 Following a strike by IBEW in 1953, the union and SCE entered into a strike settlement agreement that provided inter alia:
 
 PREAMBLE
 
 19
 The Company is a public service agency charged under the laws of the United States of America, of the State of Nevada and of the State of California with the duty of maintaining electric service under public regulations of its activities and of its rates. The Company is engaged in a public service requiring continuous operation, and the recognition of such obligation of continuous service during the term of this Agreement is imposed upon both the Company and the Union. The obligation and the duty of the Company and its working forces to maintain continuous electric service, insofar as possible within human limitations, is a basic condition of the Company's franchises and rights under law.
 
 
 20
 Inherent in the relationship established between the Company and its employees is the obligation on the part of the Company to deal justly and fairly with its employees; and on the part of the employees, to cooperate with their fellow employees and with the Company, in the performance of said public service obligation, and in the preservation of the good name and the good will of the property and the Company requisite thereto.
 
 
 21
 The Preamble became part of the collective bargaining agreement. The agreement has remained materially unchanged and was in effect at the time of the alleged unfair labor practices.
 
 
 22
 B. Unsuccessful Union Bargaining Proposals.
 
 
 23
 During the 1947 contract negotiations the union unsuccessfully proposed that the following be added to Article II, paragraph B:
 
 
 24
 B. Employees covered by this agreement shall not be required to pass picket lines in the performance of their duties.
 
 
 25
 During the 1970 contract negotiations, the Union proposed that the following paragraph be added to Article I:
 
 
 26
 No employee shall be required to cross a picket line that is sanctioned by the AFL-CIO Central Labor Council. Employees who exercise their right not to cross a picket line may be assigned to other work.
 
 
 27
 SCE opposed the change on the ground that it would interfere with its continuous service commitment imposed by various regulatory agencies. SCE noted that it had been able to work out picket line problems with the union. The union withdrew the proposal.
 
 
 28
 In 1972 the union again sought to add a provision to Article I that "no employee shall be required to cross a picket line that is sanctioned by the AFL-CIO Central Labor Council". The union acknowledged SCE's prior cooperation, but expressed concern over instances where supervisors forced unwilling employees to cross picket lines. SCE again cited the obligation imposed on it by regulatory agencies. Discussion moved to other proposals. The union did not submit picket line clauses in later negotiations.
 
 
 29
 C. Picket Line Grievance History.
 
 
 30
 Over the last 20 years SCE has required employees to cross picket lines under threat of discharge. In some instances SCE has made accommodations by rescheduling, deferring, or reassigning work, or obtaining permission to cross from the striking union. SCE apparently did not require its employees to cross a picket line when there was a threat of physical harm.
 
 
 31
 The union has filed grievances over the company's forcing employees to cross picket lines of stranger unions. Two were filed in 1969. Both were denied. SCE did not rely on the no-strike clause. The union dropped both grievances short of arbitration.
 
 
 32
 Seven such grievances were filed in 1971. In each instance, employees unwillingly crossed picket lines to perform work. SCE denied six, alleging that "timely installation" was necessary to the customer. SCE denied the other grievance on the ground that contractual and legal obligations precluded delay in the work. SCE did not rely on the no-strike clause. The union did not pursue the grievances to arbitration.
 
 
 33
 Two such grievances were filed in 1978. They led to the disputes in this case and are detailed below. For the first time SCE relied on the no-strike clause to deny the grievances.
 
 
 34
 D. The 1978 UWUA Strike.
 
 
 35
 In 1978, in anticipation of a strike by UWUA, IBEW claimed that the Act gives employees the right to honor a lawful picket line, and that the right was reaffirmed by Article I, paragraph B of the collective bargaining agreement. SCE notified the union that it strongly disagreed. It stated in part that "refusal to cross a picket line not only would directly violate (Article II) of the Contract, but could lead to disciplinary action in addition to temporary or permanent replacement." It issued supervisors' instructions to read to nonstriking employees, which warned that "(r)efusal to cross (the picket line) could lead to disciplinary action and could also lead to your permanent replacement " The union notified its members that it could not tell them whether to cross, but would support the individual's decision.
 
 
 36
 One IBEW member filed a grievance after the UWUA strike ended, alleging that he was forced to cross the picket line under threat of disciplinary action. The union relied on Article I, paragraph B in support of the grievance. SCE denied the grievance, relying on the no-strike provision.
 
 
 37
 E. The Blum Suspension.
 
 
 38
 Gary Blum has been employed by SCE since 1969. At the time of the alleged unfair labor practice, he was a polyphase testman represented by IBEW. His duties included testing and servicing SCE wiring and installing meters in the field and on customer premises.
 
 
 39
 On May 4, 1977 Blum was assigned to service a malfunctioning polyphase meter and to change a magnetic tape recorder cartridge on the premises of Freightliner Corporation. The tape records data for SCE to measure power load to satisfy a time-of-day power study ordered by the California Public Utilities Commission. The data is solely for SCE's experimental use and does not benefit Freightliner. The cartridge contains enough tape for 33 days. It had been operating for 30 days.
 
 
 40
 At the beginning of the May 4 shift, Blum notified his supervisor that he was unwilling to cross a picket line at Freightliner. Blum noted that another SCE employee was willing to cross the picket line and perform the duties. The supervisor met Blum later that morning. Blum again refused to cross the picket line. He completed his other assignment. The supervisor arranged with Freightliner personnel for Blum to cross the picket line. Later that day Blum was informed of the arrangement and that other SCE employees had crossed the line without incident. Blum said he had never crossed a union picket line and again refused to do so. The supervisor told Blum that there were no other work assignments for him and that he could go home.
 
 
 41
 Blum attempted to contact his union representative. The supervisor asked Blum to decide immediately whether or not to cross the picket line so that a replacement worker could be assigned. Blum refused to cross, left work and for the remainder of that day and the next was considered absent without pay. Another employee was assigned Blum's responsibilities at Freightliner. The work was completed without incident.
 
 
 42
 On May 5, Blum sent the following telegram to SCE:
 
 
 43
 I was available yesterday, and I continue to be available to perform all duties which do not require crossing a picket line. I will perform duties at location (sic) where a picket line exists if I do not have to cross that line. Please advise me when I should report for work.
 
 
 44
 On May 8, Blum met with various supervisors and with a union representative to discuss the situation. SCE suspended Blum for five working days under a policy providing for suspension when an employee refuses to perform regularly assigned duties.
 
 
 45
 Blum filed a grievance alleging that SCE violated Article I, paragraph B of the bargaining agreement. SCE denied the grievance on the basis of the no-strike clause.
 
 PROCEEDINGS BELOW
 
 46
 The General Counsel charged that SCE violated section 8(a)(1) of the Act by threatening employees with disciplinary action if they refused to cross the UWUA picket line and sections 8(a)(1) and (3) by suspending Blum. The charges were consolidated and heard by an Administrative Law Judge ("ALJ").
 
 
 47
 The ALJ rejected SCE's arguments that the matter should be deferred to the grievance-arbitration procedure and that the union had waived the employees' right to honor stranger picket lines.
 
 
 48
 With some modifications the Board adopted the ALJ's findings. The Board directed SCE to cease and desist from unfair labor practices and from interfering with its employees' statutory rights. Affirmatively, the order required SCE to expunge its records of reference to Blum's refusal to work, to make Blum whole for lost wages, and to post appropriate notices.
 
 ISSUES
 
 49
 (1) Whether the Board properly concluded that employees have a statutory right to honor picket lines.
 
 
 50
 (2) Whether the Board permissibly concluded that the union did not waive employees' rights to honor stranger picket lines at the employer's place of business or at a customer's place of business.
 
 
 51
 (3) Whether the Board permissibly concluded that SCE did not have a proper business necessity defense to justify either the threatened discipline or the suspension of Blum.
 
 STANDARDS OF REVIEW
 
 52
 We must enforce the Board's order if the Board correctly applied the law and if its findings of fact are supported by substantial evidence in the record viewed as a whole. E. g., Los Angeles Marine Hardware Co. v. NLRB, 602 F.2d 1302, 1305 (9th Cir. 1979). The Board's interpretation of the Act is subject to judicial review, but must be upheld if reasonably defensible. Ford Motor Co. v. NLRB, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979); NLRB v. Iron Workers, 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978).
 
 
 53
 The Board's responsibility may require it to interpret contract terms to enforce the Act. NLRB v. C & C Plywood Corp., 385 U.S. 421, 428-29, 87 S.Ct. 559, 563-64, 17 L.Ed.2d 486 (1967). If the Board's interpretation is reasonable and not inconsistent with the Act's policies, it is entitled to deference from the courts. E. g., NLRB v. Gould, Inc., 638 F.2d 159, 164 (10th Cir. 1980); W-I Canteen Service, Inc., v. NLRB, 606 F.2d 738, 747 (7th Cir. 1979); NLRB v. C. K. Smith, 569 F.2d 162, 167 (1st Cir. 1977), cert. denied, 436 U.S. 957, 98 S.Ct. 3070, 57 L.Ed.2d 1122 (1978); News Union of Baltimore v. NLRB, 393 F.2d 673, 678 (D.C.Cir.1968).
 
 DISCUSSION
 
 54
 I. Protected Activity.
 
 
 55
 Section 7 of the Act provides that employees "shall have the right to assist labor organizations, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection " 29 U.S.C. § 157. Section 8(a)(1) makes it an unfair labor practice to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in (section 7)." 29 U.S.C. § 158(a)(1).
 
 
 56
 A. Honoring the UWUA Picket Line.
 
 
 57
 It is undisputed that the right to strike is protected by section 7. E. g., NLRB v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 181, 87 S.Ct. 2001, 2007, 18 L.Ed.2d 1123 (1967); NLRB v. Erie Resistor Corp., 373 U.S. 221, 233, 83 S.Ct. 1139, 1148, 10 L.Ed.2d 308 (1965). It is also undisputed that section 7 protects employees who engage in sympathy strikes in support of a lawful primary strike by a sister union of the same employer.[1] iE. g., Delaware Coca-Cola Bottling Co. v. General Teamster Local 326, 624 F.2d 1182 (3d Cir. 1980); W-I Canteen Service, Inc., supra, 606 F.2d 738. Hence, the members of IBEW employed by SCE had the right to honor the UWUA picket line.
 
 
 58
 B. Honoring the Freightliner Picket Line.
 
 
 59
 SCE challenges the Board's extension of protection to Blum's refusal to cross a lawful picket line to perform assigned work at a customer's place of business. SCE contends that such employees lack a direct economic interest in the primary dispute and therefore may lack the necessary "mutuality." See C. K. Smith & Co., supra, 569 F.2d at 165 n.1. SCE argues that Blum's refusal to cross the Freightliner picket line was not protected by section 7 because there was no mutuality of purpose or aid, since the refusal did not affect Freightliner. The ALJ found that the tape which Blum was assigned to change was solely for the experimental use of SCE and did not assist Freightliner in the performance of its operations. The ALJ did not mention any benefit to Freightliner from Blum's other duty of servicing a malfunctioning polyphase meter.
 
 
 60
 The Board has interpreted the Act to protect employees who honor a picket line at a customer's place of business. E. g., Redwing Carriers, Inc., 137 NLRB 1545 (1962), mod'g 130 NLRB 1208 (1961), enf'd sub nom. Teamsters Local 79 v. NLRB, 325 F.2d 1011 (D.C.Cir.1963), cert. denied, 377 U.S. 905, 84 S.Ct. 1165, 12 L.Ed.2d 176 (1964). The Board has concluded that whether the employees' refusal to cross constituted an economic detriment to the struck employer is not determinative of whether the refusal is protected. Other appellate courts have upheld the Board's position. E. g., NLRB v. Alamo Express, Inc., 430 F.2d 1032 (5th Cir.), cert. denied, 400 U.S. 1021, 91 S.Ct. 584, 27 L.Ed.2d 633 (1970); Teamsters Local 657 v. NLRB, 429 F.2d 204 (D.C.Cir.1970); NLRB v. Rockaway News Supply Co., 197 F.2d 111 (2d Cir.1951), aff'd on other grounds, 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953). This circuit has not decided the question.[2]
 
 
 61
 An integral part of any strike is persuading other employees to withhold their services and join in making the strike more effective. "It cannot be denied that respect for the integrity of the picket line may well be the source of strength of the whole collective bargaining process in which every union member has a legitimate and protected economic interest." NLRB v. Union Carbide Corp., 440 F.2d 54, 56 (4th Cir.), cert. denied, 404 U.S. 826, 92 S.Ct. 96, 30 L.Ed.2d 55 (1971). Employees who honor a primary picket line in effect join the strike. NLRB v. West Coast Casket Co., 205 F.2d 902, 908 (9th Cir. 1953). Such activity is assistance to a labor organization for "mutual aid or protection." The sympathetic strikers "know that by their action each one of them assures himself of the support of the one whom they are then helping; and the solidarity so established is 'mutual aid' in the most literal sense." Houston Insulation Contractors Ass'n v. NLRB, 386 U.S. 664, 668-69, 87 S.Ct. 1278, 1280-81, 18 L.Ed.2d 389 (1967). Although reciprocity may be indirect, respect for another union's picket line leads to a stronger labor movement. See Peter Cailler Kohler Swiss Chocolates Co., Inc. v. NLRB, 130 F.2d 503, 505-06 (2d Cir. 1942).
 
 
 62
 Activities for "mutual aid or protection" within the meaning of section 7 are not limited to those within the employer-employee relationship or those aimed at changing terms and conditions of employment. Section 7 protects employees' concerted lobbying for changes in national policy regarding job security. Kaiser Engineers v. NLRB, 538 F.2d 1379, 1384-85 (9th Cir. 1976).
 
 
 63
 The Act protects employees who "engage in otherwise proper concerted activities in support of employees of employers other than their own." Eastex, Inc. v. NLRB, 437 U.S. 556, 564, 98 S.Ct. 2505, 2511, 57 L.Ed.2d 428 (1978) (footnote omitted). At some point, however, "the relationship (to employee interests) becomes so attenuated that an activity cannot fairly be deemed to come within the 'mutual aid or protection' clause." Id. at 568, 98 S.Ct. at 2513. It is the Board's responsibility in the first instance to decide whether such activity is protected. Id.; Republic Aviation Corp. v. NLRB, 324 U.S. 793, 798, 65 S.Ct. 982, 985, 89 L.Ed. 1372 (1945).
 
 
 64
 The Board's interpretation of the Act to protect an employee who honors a lawful picket line at a customer's place of business is reasonably defensible. Ford Motor Co., supra, 441 U.S. at 497, 99 S.Ct. at 1849. We must uphold the Board's determination that Blum's refusal to cross the Freightliner picket line was protected activity.
 
 II. Waiver
 
 65
 SCE contends that the union waived, by collective bargaining, the employees' right to engage in sympathy strikes. A waiver would preclude an unfair labor practice finding, since SCE has the right to discipline employees who violate the contract. SCE relies on the no-strike provision, the Preamble, and the parties' collective bargaining and grievance histories. We must determine whether the Board's interpretation of the contract is permissible.
 
 
 66
 The right to strike may be waived by the collective bargaining agreement. Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956). The right to engage in sympathy strikes may also be waived. NLRB v. Rockaway News Supply Co., 345 U.S. 71, 80, 73 S.Ct. 519, 524, 97 L.Ed. 832 (1953). See also Delaware Coca-Cola Bottling Co., supra, 624 F.2d at 1184; W-I Canteen Service, Inc., supra, 606 F.2d at 743.
 
 
 67
 The Board requires that a waiver must generally be "clear and unmistakable".[3] See, e. g., Delaware Coca-Cola Bottling Co., supra; C. K. Smith & Co, supra, 569 F.2d at 162. Waiver may be found in unequivocal extrinsic evidence bearing on ambiguous contract language. Operating Engineers, Local 18 (Davis-McKee, Inc.), 238 NLRB 58 (1978). Alternatively, a waiver may be implied by a binding arbitration clause. Even in the case of an express no-strike clause, the waiver of the right to strike is generally coterminous with the scope of the arbitration clause. See Gary-Hobart Water Corp. v. NLRB, 511 F.2d 284 (7th Cir.), cert. denied, 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1975). The Board found no clear and unmistakable waiver, notwithstanding the union's unsuccessful contract proposals expressly recognizing the right to engage in sympathy activity. It determined that the no-strike provision of the contract was implicitly tied to the arbitration clause and therefore limited to arbitrable disputes.
 
 
 68
 To determine whether the union has waived the right to engage in sympathy strikes the Board analyzes the language of the collective bargaining agreement and the factual circumstances of the labor controversy.[4] See W-I Canteen Service, supra, 606 F.2d at 743; Iowa Beef Processors v. Amalgamated Meat Cutters, 597 F.2d 1138, 1144 (8th Cir.), cert. denied, 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979). The Board views the contract as a whole and in light of the law relating to it when last ratified prior to the incidents at issue. Mastro Plastics Corp., supra, 350 U.S. at 279, 76 S.Ct. at 356.
 
 
 69
 A. Clear and Unmistakable Waiver in the Contract.
 
 
 70
 A contract need not explicitly prohibit sympathy strikes to show intent to waive the right to engage in such activity. E. g., Delaware Coca-Cola Bottling Co., supra, 624 F.2d at 1185 n.1; W-I Canteen Service, supra, 606 F.2d at 745. We must review the Board's construction of the contract as a whole and of the surrounding evidence of the parties' intent.
 
 
 71
 The contract's broad prohibition on the right to strike is not necessarily a clear and unmistakable waiver of the right to engage in sympathy strikes. E. g., Delaware Coca-Cola Bottling Co., supra at 1185; C. K. Smith & Co., supra, 569 F.2d at 167. Broad no-strike clauses coupled with other indicia of intent to waive the right to engage in sympathy strikes have been held to be an effective waiver. E. g., W-I Canteen Service, Inc., supra; Montana-Dakota Utilities Co. v. NLRB, 455 F.2d 1088 (8th Cir. 1972). The contract does not mention sympathy strikes, nor does it contain a picket line clause. See, W-I Canteen Service, supra; Iowa Beef Processors, supra, 597 F.2d at 1144 (contracts containing picket line clauses).
 
 1. Preamble
 
 72
 Article II, containing the broad no-strike provision, is entitled "Continuity of Service to the Public". The Preamble acknowledges SCE's role as a public utility required to render continuous service. SCE contends that the Preamble and the no-strike clause together constitute the necessary clear and unmistakable waiver of the right to engage in sympathy strikes. The Board found otherwise.
 
 
 73
 The parties' acknowledgement of SCE's role and obligation as a public utility does not necessarily constitute a waiver of section 7 rights. Section 7 applies to public utilities. 93 Cong.Rec. 3835 (1947); Division 1287, Amalgamated Association of Street, Electric Railway & Motor Coach Employees v. Missouri, 374 U.S. 74, 82, 83 S.Ct. 1657, 1662, 10 L.Ed.2d 763 (1963). The Board's conclusion that the Preamble and the no-strike provision do not together constitute a clear and unmistakable waiver of the right to engage in sympathy strikes is reasonable and not inconsistent with the Act's policies. We must uphold it.[5]2. Bargaining History
 
 
 74
 SCE contends that the union, in attempting to insert a picket line clause, sought more than confirmation of the right to engage in sympathy strikes. SCE argues that these attempts show that the union understood the right to have been waived, and sought to regain it.
 
 
 75
 A union does not necessarily waive a right by failing to negotiate a contractual confirmation. Timken Roller Bearing Co. v. NLRB, 325 F.2d 746, 750-51 (6th Cir.), cert. denied, 376 U.S. 971, 84 S.Ct. 1135, 12 L.Ed.2d 85 (1964). Silence in the bargaining agreement cannot be considered to be a waiver even in light of the bargaining history. Id. at 751. The failure to obtain a contractual confirmation of a right is evidence of waiver, e. g., Rockaway News Supply Co., supra, 345 U.S. at 80, 73 S.Ct. at 524, only if it shows that the union thought the right had been waived by other provisions of the contract and sought to regain the right. See, e. g., W-I Canteen Service, Inc., supra, 606 F.2d at 745 (picket line clauses delineated the boundaries of the waiver expressed in the no-strike clause).
 
 
 76
 The Board adopted the findings of the ALJ that the union's failure to obtain contractual recognition of the right did not constitute a waiver. The ALJ concluded that the proposed picket line clause was never linked with the no-strike provision so as to modify the no-strike obligation. She found that SCE never suggested in the negotiations that a refusal to cross a picket line was prohibited by the no-strike clause.
 
 
 77
 The union stated that the proposed picket line clause was intended to clarify its rights and to end the possibility of confusion among supervisors as to crossing picket lines. The Board concluded that the union was not seeking to regain rights it believed were waived. It held that the union's attempt to amend the collective bargaining agreement was not unequivocal evidence of waiver. Because the Board's conclusion is reasonable and not inconsistent with the Act's policies, we must uphold it.[6]
 
 3. Other Indicia of Waiver
 
 78
 SCE argues that four other factors show a waiver: (1) the statement in the parties' 1953 strike settlement agreement that their mutual service obligation "is of the essence of the contract of employment "; (2) the management prerogatives clause expressly reserving SCE's right to discipline employees; (3) the company's practice of requiring employees to cross picket lines to perform essential services; and (4) the grievance history, showing that SCE consistently denied grievances by employees threatened with discharge for refusing to cross a picket line.
 
 
 79
 When viewed in light of the parties' bargaining, grievance, and strike histories, these factors support an inference that the union waived the right to engage in sympathy strikes.[7] This inference is insufficient, however, to overcome the deference due the Board's interpretation of collective bargaining agreements. Gould, Inc., supra, 638 F.2d at 164; C. K. Smith & Co., supra, 569 F.2d at 167; Newspaper Production Co. v. NLRB, 503 F.2d 821, 830 (5th Cir. 1974). Deference is due the Board's interpretation of labor contracts because such contracts are different in nature and scope from ordinary commercial contracts. The labor contract is closely bound up with labor-management experience, as well as with the negotiating traditions of the industry and the particular parties. See Syufy Enterprises v. Northern California State Ass'n of IATSE Locals, 631 F.2d 124, 125-26 (9th Cir. 1980). As such, labor contract interpretation falls within the area of the Board's special expertise. In comparing the inferences suggested by SCE with the required deference due the Board, we conclude the inferences are insufficient in this case to overcome the required deference.
 
 
 80
 B. Waiver by Operation of the Arbitration Clause.
 
 
 81
 1. No-strike and Arbitration Clauses: Coterminous Application
 
 
 82
 SCE correctly contends that the right to engage in sympathy strikes may be waived by operation of an arbitration clause. An express or implied no-strike obligation is the quid pro quo for an employer's undertaking to submit grievance disputes to arbitration. Boys Markets, Inc. v. Retail Clerks Local 770, 398 U.S. 235, 248, 90 S.Ct. 1583, 1591, 26 L.Ed.2d 199 (1970).
 
 
 83
 Absent explicit expression to the contrary, the agreement to arbitrate and the obligation not to strike are coterminous. Gateway Coal Co. v. United Mine Workers, 414 U.S. 368, 382, 94 S.Ct. 629, 638, 38 L.Ed.2d 583 (1974). The no-strike obligation is limited to disputes over arbitrable issues. E. g., Gould Inc., supra, 638 F.2d at 164-65; Delaware Coca-Cola Bottling Co., supra, 624 F.2d at 1187. A sympathy striker's refusal to cross a stranger picket line does not violate a general no-strike clause. Because the underlying dispute is between a secondary employer and its union, the dispute is not subject to the arbitration provisions of the sympathetic striker's collective bargaining agreement.[8] E. g., Gary-Hobart Water Corp., 511 F.2d at 288.
 
 
 84
 In the instant case, the parties negotiated a broad no-strike clause. The arbitration clause provides that only "grievances involving the interpretation or application of this Agreement may be submitted to arbitration." The Board concluded from this evidence that the clauses were coextensive. The arbitration clause did not prohibit Blum's sympathy strike because the underlying dispute at Freightliner was not arbitrable.
 
 
 85
 SCE argues that the no-strike clause is broader than the arbitration clause because the former expressly requires exhaustion of legal remedies under the Act. The ALJ concluded that the effect of this provision is unclear.
 
 
 86
 The provision is ambiguous. It could be interpreted to prohibit strikes until legal remedies provided by the Act are exhausted. Alternatively, the provision may simply commit employees to seek judicial assistance where the company refused to arbitrate or to comply with an arbitral award. The Board concluded that the provision did not reveal a clear intent to create a functionally independent no-strike clause. Because the Board's conclusion is reasonable and not inconsistent with the Act's policies, we must uphold it.2. Arbitrability of the Scope of the Arbitration Clause.
 
 
 87
 Even assuming coterminous application, SCE argues that Blum was obligated not to strike until the scope of the arbitration clause was arbitrated. SCE contends that whether a sympathy strike violated the agreement was itself arbitrable. The collective bargaining agreement specifies that the scope of the arbitration clause is itself arbitrable.
 
 
 88
 The applicability of a no-strike clause to a sympathy strike is subject to arbitration. Yet the arbitrability of the scope of a no-strike clause must be distinguished from the arbitrability of the underlying dispute. The dispute underlying a primary strike is not arbitrable between the sympathy strikers and their employer. A sympathy strike can not, therefore, be enjoined pending arbitration of the scope of a no-strike clause. An agreement to arbitrate disputes does not necessarily imply a promise to refrain from sympathy strikes pending arbitration. Buffalo Forge Co. v. United Steelworkers, 428 U.S. 397, 407-08 & n.10, 96 S.Ct. 3141, 3147-48 & n.10, 49 L.Ed.2d 1022 (1976).
 
 
 89
 The Board did not infer from the no-strike and arbitration clauses, and the parties' bargaining and grievance history, that the union waived the right to engage in sympathetic activity. Given the deference due the Board's interpretation of a collective bargaining agreement and the surrounding circumstances, we cannot overturn the Board's decision.
 
 III. Business Justification
 
 90
 Employees' rights to engage in protected activity must be balanced against the employer's legitimate and substantial business interests. E. g., Overnite Transportation Co., 154 NLRB 1271 (1965). See generally NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 378, 88 S.Ct. 543, 545, 19 L.Ed.2d 614 (1967); NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 33-34, 87 S.Ct. 1792, 1797-1798, 18 L.Ed.2d 1027 (1967). It is the primary responsibility of the Board "to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy." Great Dane Trailers, supra, 388 U.S. at 33-34, 87 S.Ct. at 1797-1798.
 
 
 91
 The employer has the right to attempt to run its business despite sympathy strike activity. It may treat an employee who honors a lawful picket line at its place of business as an economic striker, subject to permanent replacement. It need not articulate a legitimate business necessity for doing so. Gary-Hobart Water Corp., 210 NLRB 742 (1974), enf'd, 511 F.2d 284 (7th Cir. 1975). When the refusal to cross a stranger picket line results in only partial work stoppage, the employer must demonstrate a legitimate business justification for replacing an employee. Redwing Carriers, Inc., supra, 137 NLRB 1545.
 
 
 92
 A. Threats of Discipline.
 
 
 93
 The Board held that SCE's threat to replace employees who honored UWUA picket lines was lawful, but that SCE's threat to discipline such employees was not. SCE argues that its threat of discipline was lawful, since it was not carried out.
 
 
 94
 The Act prohibits an employer from acting to intimidate and coerce employees not to engage in protected activities. E. g., NLRB v. Gulf-Wandes Corp., 595 F2d 1074, 1080 (5th Cir. 1979); NLRB v. Albion Corp., 593 F.2d 936, 939 (10th Cir. 1979); Swearingen Aviation Corp. v. NLRB, 568 F.2d 458, 461 (5th Cir. 1978). Section 8(a)(1) protects employees who engage in lawful union activity from even the idle threat of retaliation. Albion Corp., supra, at 939. The Board's conclusion that SCE violated section 8(a)(1) by threatening to discipline employees if they honored UWUA's picket line is a reasonably defensible interpretation of the Act, and must be upheld.
 
 
 95
 B. Blum's Replacement and Suspension.
 
 
 96
 In instances of partial work stoppage, the company may replace an employee only if it acts to preserve the efficient operations of its business. See Redwing Carriers, Inc., supra, 137 NLRB 1545. Once the employer has demonstrated a legitimate business reason, the burden shifts to the General Counsel to establish that the primary motivation for the employer's action was to penalize the employee for engaging in protected activity. See NLRB v. Swain & Morris Construction Co., 431 F.2d 861, 862 (9th Cir. 1970). See also NLRB v. William S. Carroll, Inc., 578 F.2d 1, 4 (1st Cir. 1978).
 
 
 97
 SCE argues that Blum's replacement and suspension were necessary to preserve the efficient operation of the company. The Board found that the replacement and suspension had no legitimate business justification.
 
 
 98
 1. Replacement.
 
 
 99
 We are unable to find substantial evidence in the record supporting the Board's finding that SCE lacked a legitimate business justification for replacing Blum. There was evidence that the tape Blum was assigned to replace would shortly expire and that SCE had an important interest in the repair of the polyphase meter. Although the situation may not yet have become an emergency, SCE was allowed to replace Blum to maintain reasonable, normal business operations.
 
 
 100
 2. Suspension.
 
 
 101
 There is substantial evidence in the record supporting the Board's finding that no business necessity required SCE to treat Blum as absent without pay on May 5 and to suspend him the following week. There is evidence that SCE relied on the no-strike provision of the contract to justify the disciplinary action, rather than on business necessity.
 
 CONCLUSION
 
 102
 Honoring a sister picket line at one's employer's place of business and respecting a picket line at a customer's location are activities protected by section 7 of the Act. Although the protection can be waived by contract, the language and evidence bearing on the parties' intent in this case are insufficient to overcome the deference due the Board's determination that there was no waiver. The Board's conclusion that SCE violated the Act by threatening to discipline employees who honored a sister union picket line is reasonably defensible. The Board's finding that SCE lacked a business justification for disciplining an employee for honoring a stranger picket line at a customer's place of business is supported by substantial evidence. There is not substantial evidence supporting the Board's finding that SCE violated the Act by replacing the employee who refused to cross a picket line to perform work on a customer's premises.
 
 
 103
 The Board's order will be enforced as modified.
 
 
 104
 MARKEY, United States Customs and Patent Judge, dissenting:
 
 
 105
 Convinced that the inference of waiver is so inescapable as to overcome deference admittedly due board interpretations, I respectfully dissent. See Amcar Division, ACF v. National Labor Relations Board, 641 F.2d 561 (8th Cir. 1981), 33 Daily Labor Report, D-1.
 
 
 
 *
 The Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation
 
 
 [1]
 This point is not determined by the proviso to section 8(b)(4) which states: "(N)othing (herein) shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer) if the employees of such employer are engaged in a (lawful) strike " 29 U.S.C. § 158(b)(4). That such activity is not unlawful does not necessarily mean that it is protected. The proviso appears to allow parties to a collective bargaining agreement to decide whether to protect such activity. NLRB v. Rockaway News Supply Co., 345 U.S. 71, 80, 73 S.Ct. 519, 524, 97 L.Ed. 832 (1953). See, e. g., Kellogg Co. v. NLRB, 457 F.2d 519, 523 (6th Cir.), cert. denied, 409 U.S. 850, 93 S.Ct. 58, 34 L.Ed.2d 92 (1972). But see Rockaway News Supply Co., supra, 345 U.S. at 81-82, 73 S.Ct. at 525 (Black, J., dissenting); Truck Drivers Local 413 v. NLRB, 334 F.2d 539 (D.C.Cir.), cert. denied, 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964) (picket line clause protects employees who refuse to cross a lawful picket line at the premises of another employer). No definitive interpretation of the proviso has been advanced. See Axelrod, The Statutory Right to Respect a Picket Line, 83 Dick.L.Rev. 617, 627-29 (1979)
 
 
 [2]
 In NLRB v. Swain & Morris Construction Co., 431 F.2d 861 (9th Cir. 1970), this court assumed, without deciding, that an employee's refusal to cross a picket line at an employer other than his own is protected activity. The employer did not argue below that the refusal to cross was unprotected, and the court declined to address it for the first time on appeal
 
 
 [3]
 This requirement originally applied to waivers of the right to strike over unfair labor practices, e. g., Mastro Plastics Corp., supra, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309, but has since been applied to sympathy activity
 
 
 [4]
 The parties dispute the propriety of using extrinsic evidence to interpret the contract provisions. The ALJ found sufficient ambiguity to resort to collateral evidence. See News Union of Baltimore, supra, 393 F.2d at 678
 
 
 [5]
 Amcar Div., ACF Indus. v. NLRB, 641 F.2d 561, 106 LRRM 2518 (8th Cir. 1981) and Montana-Dakota Util. Co., supra, 455 F.2d 1088 are distinguishable. In the former, the court held, without considering the standard of review, that the contract waived the right to honor a stranger picket line. In that case, there was a broad no-strike clause, and strong evidence that the union believed that the contract waived the right. 106 LRRM at 2523-24. See also St. Regis Paper Co., 253 NLRB No. 162, 106 LRRM 1207 (Jan. 9, 1981). In Montana-Dakota, the court also held that the right to honor a stranger picket line was waived. The contract in that case contained an express picket line clause, and the obligation to provide continuous service was expressly tied to the no-strike clause. None of these factors are present in the instant case
 
 
 [6]
 We decline to address the General Counsel's argument that the scope of the picket line clause proposed by the union went beyond a mere contractual confirmation of a statutory right. There is no indication that the Board relied on this theory in rejecting SCE's argument that the union's failure to gain express recognition was a waiver
 
 
 [7]
 We reject the General Counsel's suggestion that the no-strike language addressed only union-sponsored activity and left individual employees free to engage in strike activity. See Allis-Chalmers Mfg. Co., supra, 388 U.S. at 180, 87 S.Ct. at 2006 (1967); Kellogg Co., supra, 457 F.2d at 523-24 (waiver of the right to honor stranger picket lines binds all members of the bargaining unit)
 
 
 [8]
 Parties to a collective bargaining agreement can create functionally independent no-strike and arbitration clauses. E. g., W-I Canteen Service, supra, 606 F.2d at 744. The evidence of such an intent here is insufficient to overcome the Board's finding to the contrary. In the absence of such evidence, the "quid pro quo theory underlying coterminous interpretation applies where there is an express no-strike clause in the contract." Delaware Coca-Cola Bottling Co., supra, 624 F.2d at 1186